CITRONELLE–MOBILE GATHERING, INC., Plaintiff,

v.

GULF OIL CORPORATION, Defendant/Counterclaimant,

and

Federal Energy Administration, Defendant.

Civ. A. No. 75–483–P.

United States District Court, S. D. Alabama, S. D.

Aug. 20, 1976.

As Amended Oct. 20, 1976.

Harold D. Parkman and David A. Bagwell, Mobile, Ala., Lester M. Bridgeman, Washington, D.C., Lewis G. Odom, Jr., Montgomery, Ala., for plaintiff.

W. B. Edwards, Asst. Gen. Counsel, John E. Bailey and Catherine C. McCulley, Houston, Tex., for Gulf Oil Corp.

C. S. White-Spunner, Jr., U.S. Atty., Mobile, Ala., Rex E. Lee, Asst. Atty. Gen., Stanley D. Rose and Marvin L. Coan, Dept. of Justice, Washington, D.C., for Federal Energy Administration.

## OPINION AND ORDER

PITTMAN, Chief Judge.

The plaintiff is Citronelle-Mobile Gathering, Inc. (Citmoco), a corporation organized and existing under the laws of the State of Delaware and with its principal place of business in Mobile, Alabama. Citmoco is engaged in the business, in this district, of purchasing of crude oil from the Citronelle field, Citronelle, Mobile County, Alabama. It also transports such crude oil to a terminal in Mobile, Alabama, for storage and resale on tidewater in Mobile.

The defendant Gulf Oil Corporation (Gulf) is a corporation organized and existing under the laws of Pennsylvania with its principal place of business in Pittsburgh. Gulf is engaged in the business of producing, refining, and selling crude oil and petroleum products. Gulf is qualified to do, and is doing, business in Mobile, Alabama. The jurisdiction of this court is invoked pursuant to the provisions of 28 U.S.C. § 1332(a). The complaint alleges an amount in controversy exceeding $10,000 exclusive of interest and costs. The venue is in this district pursuant to 28 U.S.C. § 1391(a), § 1391(c), and § 1393.

Citmoco proceeds on three causes of action. First, they seek damages in the amount of $4,390,540.83 for an alleged breach of contract by Gulf with Citmoco for the purchase of crude oil. Citmoco sold 337,734 net barrels of Citronelle crude oil to Gulf at Mobile, Alabama, at an agreed price of $13.00 a barrel on September 9, and September 29, 1975. Citronelle claims Gulf on September 30, 1975, repudiated that contract and refused to pay Citmoco more than $5.40 a barrel on Citronelle crude.

In the second cause of action Citmoco claims that during the period of September 29 to December 21, 1975, it sold 691,395.3 additional net barrels of crude oil to Gulf under the terms of an agreement for $13.00 a barrel, but that Gulf paid instead $5.40 per net barrel. Citmoco seeks recovery of the difference between the $5.40 and $13.00 a barrel.

Gulf claims that the recovery sought by Citmoco in all three causes of action is barred by the Emergency Petroleum Allocation Act of 1975 (EPAA), P.L. 94–99, Federal Energy Administration (FEA) Regulations 10 C.F.R., Part 212 and FEA Ruling 1975–17.

Gulf has filed a counter-claim in the amount of $558,583.95 for a September 1, 1975, purchase for which Gulf paid Citmoco $13.00 per barrel. Under the above regulations Gulf claims a refund which represents a difference between the regulated price of $5.40 per barrel and the paid price of $13.00 per barrel. They have demanded and been refused the refund by Citmoco.

Gulf invokes jurisdiction of this court pursuant to 15 U.S.C. § 754 as amended by P.L. 94–99 and 28 U.S.C. § 1332(a). Gulf contends that FEA Regulation 10 C.F.R., Part 212, prohibits Gulf from paying Citmoco more than $5.40 per barrel. Venue is claimed in accordance with 28 U.S.C. § 1391.

The Federal Energy Administration (FEA) was permitted to intervene as Intervenor-defendant. FEA took no position with respect to the total amounts of oil delivered, the total amount paid, or the total claimed in an alleged overpayment by Gulf. FEA is an agency and instrumentality of the United States under the Federal Energy Administration Act of 1974, 15 U.S.C., § 761, et seq., and was established by Executive Order 11790, June 27, 1974.

FEA contends there was a valid ceiling price of $5.40 during the period set out in the complaint and counter-claim. It also contends that if there were "substantial constitutional issues" during the September 1–29, 1975, period, this court is bound to certify the issues to the Temporary Emergency Court of Appeals (TECA). FEA further contends that if there are no substantial constitutional issues, the sales of "old" crude oil could not exceed the Agency's maximum lawful ceiling price of $5.40 per barrel.

## FINDINGS OF FACT

During the period when the nation's energy policy was being hotly debated and before the Regulations expired on August 31, 1975, Citmoco and Gulf entered into an agreement providing that effective September 1, 1975, and until any later imposition of valid price controls on the sale of crude oil, Citmoco would sell, and Gulf would purchase, any and all Citronelle crude that Citmoco had available for resale at Mobile, at $13.00 per barrel. On September 1, 1975, Gulf purchased and accepted delivery from plaintiff of 313,466.72 barrels of Citronelle crude. On September 2, 1975, Gulf was invoiced for this crude oil at the rate of $13.00 per barrel for a total amount of $4,075,067.36, which amount was paid to Citmoco prior to September 29, 1975. On September 9 and 29, 1975, Citmoco sold and delivered to Gulf a total of 337,733.91 barrels of Citronelle crude for which Citmoco invoiced Gulf at the agreed rate of $13.00 per barrel. Gulf has not paid Citmoco the invoiced purchase price for the September 9 and 29 delivery of crude oil. On October 26, November 22, and December 14, 1975, Citmoco sold and delivered to Gulf a total of 691,395.3 barrels of Citronelle crude oil for which Gulf paid Citmoco at the rate of $5.40 per barrel.

As of September 29, 1975, the date of the enactment of EPAA of 1975, Gulf had not paid Citmoco the charges invoiced to Gulf for the September 9 and September 29 purchases of crude oil. Gulf thereafter notified Citmoco that it could not pay such invoices, asserting that it was prohibited by reason of the enactment of EPAA of 1975. Citmoco is also claiming the difference between the $5.40 paid and the agreed $13.00 per barrel as a balance due for the October, November, and December 1975 deliveries. This would be a valid claim based on an agreed price if there were not valid regulations of the price of crude oil at a lesser price. Citmoco claims there were no effective price controls during this period.

Gulf claims it is prohibited by law from paying more than the EPAA ceiling of $5.40 per barrel, and has filed a counter-claim for the excess over $5.40 per barrel paid to Citmoco for the September 1, 1975 purchase. It claims the EPAA regulation is retroactive.

## CONCLUSIONS OF LAW

Plaintiff asserts jurisdiction pursuant to the provisions of Title 28 U.S.C. § 1332(a).

This court has jurisdiction of defendant Gulf's counter-claim under Section 210 of the Economic Stabilization Act of 1970, as amended 12 U.S.C. § 1904, note, and as incorporated into the Emergency Petroleum Allocation Act of 1973, as amended by P.L. 94–99, 15 U.S.C. § 751, et seq., which incorporated Federal Energy Administration, 10 C.F.R. Part 212.

Venue is properly laid in this district under 28 U.S.C. § 1391 and § 1393. Under § 210(a) of the Economic Stabilization Act:

"Any person suffering legal wrong because of any act or practice arising out of [EPAA of 1973, as amended] . . . or any order or regulation issued pursuant thereto, may bring an action in a district court of the United States, without regard to the amount in controversy, for appropriate relief . . . and/or damages."

The Emergency Petroleum Allocation Act of 1975 reinstated FEA price control (10 C.F.R., Part 212) retroactive to September 1, 1975.

FEA has been delegated all authority under the Emergency Petroleum Allocation Act of 1973, 15 U.S.C. §§ 751, et seq., as recently amended by the Energy Policy and Conservation Act, 15 U.S.C. § 754, to promulgate and enforce price regulations relating to petroleum and petroleum products. The authority to regulate the prices of petroleum and petroleum products was formerly exercised by the Cost of Living Council (COLC) pursuant to duly delegated authority under the Economic Stabilization Act of 1970, as amended, 12 U.S.C. § 1904, note.

Pursuant to the Economic Stabilization Act, Executive Orders issued pursuant thereto, and various delegations of authority, the COLC promulgated "Phase IV Price Regulations" relating to petroleum and petroleum products, shown as 6 C.F.R. Part 150, Subpart L., § 150.351, et seq., (promulgated 38 F.R. 22536, August 22, 1973, as amended 38 F.R. 23794, September 4, 1973).

Pursuant to the EPAA and the delegations of authority contained in Executive Order 11790, the COLC price regulations relating to petroleum and petroleum products were re-enacted in substance by the FEA at 10 C.F.R. Part 212, subpart D, § 212.91, et seq. (39 F.R. 1924, et seq., January 15, 1974). The President was authorized by Section 4(a) of the EPAA of 1973 to promulgate a "regulation providing for the mandatory allocation of crude oil, residual fuel oil, and each refined petroleum product, in amounts specified in . . . and at prices specified in . . . such regulation." 15 U.S.C. § 753(a).

Under FEA price regulations pertaining to the pricing of crude oil, a two-tier pricing system was adopted. Under the two-tier pricing system, the Regulations prescribed a ceiling price on domestic crude oil produced from a given property when production is at or below the level of production from the same property in the same month of 1972 ("old" crude). Crude oil produced in excess

of 1972 production levels from the same property ("new" crude) was exempt from price controls and could be sold at an uncontrolled or free market price. During the period January 15, 1974, through August 31, 1975, the ceiling price for old oil sold by Citmoco to Gulf was $5.40 per barrel.

The Regulations in effect on August 31, 1975, (10 C.F.R. § 212.10) provided that no firm or person could charge or knowingly pay a price for crude oil which exceeded the price permitted by the Regulations, and that firms or persons which violate the Regulations would be subject to civil or criminal penalties, as well as private suits for damages. Both Citmoco and Gulf were subject to the price controls of the Regulations as the same applied to the purchase and sale of domestic crude.

Since its original passage, the Allocation Act has been extended on four occasions: P.L. 93–511 (December 5, 1974); P.L. 94–99 (September 29, 1975); P.L. 94–133 (November 14, 1975); P.L. 94–163 (December 22, 1975). The statutory authorization for price control under the EPAA of 1973, as extended, expired on August 31, 1975.

Sales of Citronelle crude oil made by Citmoco to Gulf were subject to such price controls during the months of September, October, November, and December, 1975.

■ Citmoco's demand for payment in excess of the lawful ceiling price permitted by FEA's mandatory price regulations should be denied with respect to the above transactions. Citmoco is not entitled to the contract price of $13.00 per barrel for crude oil sold to Gulf to the extent it is inconsistent with FEA regulations.

Section (a) of 15 U.S.C. § 753, provided that

"[t]he President shall promulgate a regulation providing for the mandatory allocation of crude oil . . . in amounts specified in (or determined in a manner prescribed by) and at prices specified in (or determined in a manner prescribed by) such regulation. . . . [s]uch regulation shall apply to all crude oil . . . produced in or imported into the United States."

Section (g)(1), 15 U.S.C. § 753, of the EPAA of 1973, as amended February 28, 1975, provided in pertinent part that:

"The regulation promulgated and made effective under subsection (a) [of this section] shall remain in effect until midnight August 31, 1975, except that . . . the President may exempt crude oil . . . from such regulation in accordance with paragraph (2) of this subsection."

Paragraph (2) of the subsection, 15 U.S.C. § 753(g)(2), provided that, if the President found application to crude oil of the regulation authorized by subsection (a) unnecessary to carry out the ends of the EPAA of 1973, he might exempt such oil from regulation for a period of not more than 90 days, subject to the opportunity for prior Congressional disapproval of the Executive Action.

Congress enacted legislation, S. 1849, on July 31, 1975, on a substitute bill which would have extended the price control regulation until March 1, 1976, upon the expiration of the price controls August 31, 1975. This bill was forwarded to the President on August 28, 1975, and was vetoed September 9, 1975. Therefore, the price controls without future action would have expired August 31.

During 1975, Congress, the President, and the public were engaged in a well-publicized debate on the future direction of national energy policy. During the course of the legislative process, the Emergency Petroleum Allocation Act of 1973 expired and was extended on two occasions. There is no doubt, and this court so finds, that Congress was acutely aware that there was the possibility of a gap between expiration and reinstatement of the price control law and regulations, therefore, any extension of the EPPA was intended to apply retroactively to August 31, 1975. There is no doubt that the public as a whole and the oil industry in particular was well apprised of the ongoing applicability of the Regulations during any "hiatus" period between the lapse of the

Regulations on August 31, 1975, and the enactment of an extension. Statements by the FEA on August 25 (see attachment "C" to Defendant FEA's memorandum in support of its Motion for Summary Judgment, Doc. No. 35), and a press release dated September 29, 1975, (see attachment "D" to Defendant FEA's memorandum in support of its Motion for Summary Judgment) make it clear that any extension was to apply the Regulations retroactively in order that there be no gap in their coverage. Both Gulf and Citmoco are highly sophisticated corporations with many years experience in the petroleum industry. There is little doubt that the intent of Congress and the FEA as to the retroactive application of any extension of the Regulations was fully known and appreciated by both.

The Regulations lapsed on August 31, 1975, and they were not extended until September 29, 1975, by P.L. 94–99. The statutory language indicates that the extension was intended to apply retroactively to September 1, 1975, covering any hiatus in the application of the Regulations to transactions taking place during that time period.

In that public debate, as in the President's veto message of the August 28 bill, it was clear that the President was committed to removing the ceiling on price controlled domestic oil. It was equally clear that Congress was committed to the extension of price controls.

In September 1975, Congress passed the Emergency Petroleum Allocation Act of 1975 which the President signed on September 29, 1975, more than four weeks after the expiration of the 1973 Act. The statute is as follows:

"An Act to extend the Emergency Petroleum Allocation Act of 1973.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

### SHORT TITLE

SECTION 1. This Act may be cited as the "Emergency Petroleum Allocation Act of 1975".

### EXTENSION OF MANDATORY ALLOCATION PROGRAM

SEC. 2. Section 4(g)(1) of the Emergency Petroleum Allocation Act of *1973 is amended* by striking out "August 31, 1975," wherever it appears and inserting in lieu thereof "November 15, 1975,".

SEC. 3. *It is the intent* of the Congress that the regulations promulgated under the Emergency Petroleum Allocation Act of 1973 *shall* be effective for the period between August 31, 1975, and the date of enactment of this Act.

SEC. 4. The purpose of this limited extension of the Emergency Petroleum Allocation Act is to provide Congress and the Executive adequate time and opportunity to reach mutual agreement on a long-term petroleum pricing policy. During the period of this extension it is the *intent of the Congress that the status quo shall be maintained and the President shall institute no major change in petroleum pricing policy* under section 4(g)(2) of the Act prior to November 1, 1975. Any *adjustment the President may make in price shall be in accord* with his policy on inflation impact statements and economic justification set forth in Executive Order Numbered 11821 and in Circular Numbered A–107, January 28, 1975, Office of Management and Budget.

SEC. 5. Any *Senate resolution to disapprove a Presidential decontrol* proposal submitted under section 4(g)(2) *shall be immediately* placed upon the Senate legislative calendar and any motion by the Majority Leader or his designee thereafter to proceed to the consideration of such disapproval resolution shall be decided without debate and by a majority vote; and within forty-eight hours after the disapproval resolution is made the pending business or sooner if otherwise ordered by the Senate, the Chair shall direct the Clerk to call the roll on the final disposition of the disapproval resolution without any further debate or intervening motion, any other rule or provision of law notwithstanding." (Emphasis added).

The plaintiff argues that the expression in the Act of the intent of Congress expressed only the desire of Congress that the President reissue the regulations. They further argued that this was consciously restricted to such a desire by previous use of the language in other regulations. It is contended that had Congress intended to make the regulations referred to adopted by this statute, they would have expressly said so as they did in the Emergency Price Control Act of 1942, 50 U.S.C.A., Appendix 901(b) by the Price Control Extension Act of July 25, 1946, Pub.Law 548, 79th Cong. 2nd Sess. [60 Stat. 676, c. 671, 50 U.S.C.A. 1946 Supp.Appendix § 925, 11 FCA, Title 50, Appendix 25, § 205].

■ The objective of the court in a case calling for construction of a statute is to ascertain the Congressional intent and give effect to legislative will.

■ Although the language is not as express or clear as it was in the PCEA of 1946, considering the circumstances of the debate and the contest of wills between the President and Congress, it is abundantly clear to this court that Congress intended to adopt the regulations as part of the Act as if they had used the same language as that which they used in the PCEA of 1946.

■ To hold that Section 5, which provided for a Senate resolution to disapprove any Presidential decontrol proposal expressed an intent of Congress that their language in previous sections was only advisory to the President would emasculate those mandatory expressions of intent and which to this court seems abundantly clear. The court interprets this provision as an announcement to the President that Congress would not permit any decontrol and provided a means to rapidly nullify such action should he attempt such decontrol.

The plaintiff attempts to raise constitutional issues, to wit, whether the Government may retroactively amend the terms of

a private contract and that Section 5 of the Act provides for a legislative veto in violation of the President's executive action, a violation of the separation of powers provided by the first three articles of the Constitution. It is further contended that the retroactive application of the regulations violates the due process clause of the Fifth Amendment.

■ If there are substantial constitutional questions involved, the Temporary Emergency Court of Appeals (TECA) is the proper forum. 12 U.S.C. § 1904, note.

■ Only "substantial" constitutional issues are subject to certification by a district court to the TECA. A constitutional issue is not "substantial" if (a) it is plainly without merit, or (b) if Supreme Court or TECA precedent exists to foreclose the subject raised. *National Petroleum Refiners Association, et al., v. Dunlop, et al.,* 486 F.2d 1388 (Em.App.1973); *Delaware Valley Apartment House Owners Ass'n v. United States,* 350 F.Supp. 1144 (E.D.Pa.1973), aff'd. 482 F.2d 1400 (Em.App.1973).

■ The Supreme Court has upheld the authority of the federal government to enact legislation affecting previously acquired contract rights of individuals. *Louisville & Nashville Railroad v. Mottley,* 219 U.S. 467, 31 S.Ct. 265, 55 L.Ed. 297 (1911); *Norman v. B. & O. R. Co.,* 294 U.S. 240, 55 S.Ct. 407, 79 L.Ed. 885 (1935).[1] The September 1, 1975 sales transaction between the parties which was completed at the $13.00 per barrel price is subject to being conformed to the regulations without violating any constitutional prohibition. In *Howell Electric Motors Co. v. United States,* 172 F.2d 953, 954 (6th Cir. 1949), the court stated:

"It is settled law that the retroactive reach of a statute may constitutionally cover property rights that have vested . . . and also may cover payments already received."

1. As stated in *Norman,* supra:
    "[T]here is no constitutional ground for denying to the Congress the power expressly to prohibit and invalidate contracts although previously made, and valid when made, when they interfere with the carrying out of the policy it is free to adopt."

As to the sales occurring after September 29, 1975, *Basin Inc. v. Federal Energy Administration, et al.,* 534 F.2d 324 (Em.App. 1976), held that future sales under pre-existing contracts could validly be precluded.[2]

▮ Section 3 of the EPAA of 1975 directly expresses the intent of Congress that said statute is non-penal and Citmoco faces no possible consequences from the FEA which can be deemed criminal in nature. This court finds that Citmoco's allegation that the subject legislation violates the Ex Post Facto Clause of the United States Constitution is not well taken. The Supreme Court in *Calder v. Bull,* 3 U.S. (3 Dall.) 385, 1 L.Ed. 648 (1898), laid down the basic principle that both of the Ex Post Facto Clauses only affect laws that are criminal in nature. *Calder, supra,* is the leading authority on the question and has been followed by practically all the courts.

▮ Citmoco's allegation that the retroactive application of the regulations, as extended by the September 29, 1975 extension, contravenes the Fifth Amendment's Due Process Clause is without merit and therefore does not rise to the level of being "substantial" in order that the issue be certified to the TECA. The due process clause invalidates only those statutes whose retroactivity results in measurable unfairness. *Porter v. Senderowitz,* 158 F.2d 435, cert. den., 330 U.S. 848, 67 S.Ct. 1091, 91 L.Ed. 603 (C.C.A.Pa.,1947). Although no hard and fast rule has been laid down by the Supreme Court in determining when a law as applied retroactively is fair or not there are three major factors which are to be considered.[3] These factors are: the nature and strength of the public interest served by the statute, the extent to which the statute modifies or abrogates the asserted pre-enactment right, and the nature of the right which the statute alters.

▮ As found by this court, the urgency and importance of the energy issue to the nation and its economy cannot be doubted. The public interest in maintaining continuity in the scheme of regulation is compelling in this case. A review of the legislative history of the passage of the September and November 1975 statutes which extended the EPAA of 1973 demonstrates the temporary emergency nature of the situation, the strength of the public interest involved, and the full extent of preenactment notice. It seems the plaintiff cannot claim unfairness or surprise. This court concludes that the EPAA of 1975 meets the test of fundamental fairness and there is supportive case law. It is a valid retroactive statute and such retroactivity does not rise to the standard required to be "substantial" requiring certification.

▮ The Government agrees with the contention that Section 5 is a Congressional veto of Presidential authority raises a substantial constitutional question but asserts that the plaintiff has no standing to raise this question. This court agrees.

▮ The Government further contends that if it is assumed that FEA should have repromulgated its recommendations after enactment of EPAA of 1975, the agency could have waived the 30 day notice, etc., as required by the Administrative Procedure Act premised upon a "good cause" basis.

No real purpose would have been served by requiring the redundant solicitation of public comment. This had already been previously accorded for exactly the same regulation in question. The pricing provisions under consideration are part of a comprehensive regulatory system of price and allocation control which evolved over a 2½ year period which had been carefully promulgated consistent with the standards of administrative due process including notice and opportunity to comment. Repromulga-

---

2. The court stated:
   "By the same token, sales made after the Allocation Act of September 29, 1975, are not beyond the reach of that legislation merely because they occur in performance of agreements entered into before September 29." At p. 326.

3. See Hockman, "The Supreme Court and Constitutionality of Retroactive Legislation", 73 Harvard Law Rev. 692 (1960).

tion would have required the administrative procedures be once more employed, necessitating delay and a lapse in regulatory enforcement. This would have served no useful purpose. The court considers this is not a substantial constitutional question which should be certified to the TECA.

Congress was undoubtedly aware of the delay which would have been occasioned by a republication of the regulations. This is buttressed by this court's construction that Congress intended by the language of the Act to incorporate the provisions of the regulations in the EPAA of 1975.

The court therefore finds that the EPAA of 1975 effectively reinstated FEA's mandatory price and allocation regulations by passage of the Act and intended them to be retroactively applied to the period between August 31, 1975 and September 29, 1975, the date on which the law was extended by P.L. 94–99.

It is held that the repromulgation of FEA's mandatory price and allocation regulations was not necessary in order to reinstate those regulations after August 31, 1975.

The defendant-counterclaimant is permitted to pay no more than $5.40 per barrel for each barrel of "old" crude oil during the months of September, October, November, and December, 1975. The defendant-counterclaimant is entitled to a refund in the amount of $501,077.89, which amount has been agreed upon in the event the court finds as it has in this case.

It is therefore ORDERED, ADJUDGED, and DECREED that the defendant-counterclaimant Gulf Oil Corporation have and recover on its counter-claim against the defendant Citronelle-Mobile Gathering, Inc., $501,077.89 together with costs, and for the defendant Gulf on the plaintiff's claim.