**FEDERAL ELECTION COMMISSION,**
**Plaintiff,**

v.

**Milton WEINSTEN, Winfield Manufacturing Company, Defendants.**

No. 78 Civ. 932.

United States District Court,
S. D. New York.

Dec. 7, 1978.

Office of the General Counsel, Washington, D.C., for plaintiff by Barbara Van Gelder, William C. Oldaker, Charles N. Steele, Lester N. Scall, Washington, D.C., of counsel.

Richard A. Sprague, Philadelphia, Pa., Robert K. Tanenbaum, Bleakley, Platt, Schmidt & Fritz-Bleakley Schmidt, P.C., White Plains, N.Y., for defendant.

## OPINION

SWEET, District Judge.

This is an action brought by the Federal Election Commission (FEC) charging defendants Weinsten and Winfield Manufacturing Company with violations of the Federal Election Campaign Act of 1971 ("F.E. C.A." or "the Act"). More specifically, the complaint alleges that each defendant violated the Act as follows: Each

(a) made an illegal corporate contribution, in violation of 2 U.S.C. § 441b and its predecessor 18 U.S.C. § 610;

(b) made an illegal political contribution as a government contractor, in violation of 2 U.S.C. § 441c and its predecessor 18 U.S.C. § 611; and

(c) illegally made contributions in the names of others, in violation of 2 U.S.C. § 441f and its predecessor 18 U.S.C. § 614.

*See* complaint at paragraphs 7(a), 7(b), 7(c), 8(a), 8(b)(c).

Based upon these alleged violations, the complaint seeks the following relief:

(1) A permanent injunction prohibiting defendants and their successors in interest from acting in the manner specified in the complaint.

(2) A permanent injunction prohibiting defendants and their successors in interest "from taking any adverse action or discriminating against any employee of Winfield, or former employee seeking re-employment, on the basis of that employee's cooperation with the Federal Election Commission or this court action in the matters at issue herein." Complaint at page 4.

(3) The imposition of a "civil penalty" in the amount of $10,000 against each defendant.

Defendants have now moved to dismiss the complaint on the grounds that the version of the Act in effect at the time of the alleged violations did not provide for civil damages and that to apply the provisions of the Act which were enacted subsequent to the activities alleged in the complaint would violate the ex post facto clause of the Constitution; that injunctive relief would be improper in this case; and that the relevant provisions of the Act are unconstitutional. For the reasons stated below, the motion is denied.

This case arises out of facts discovered by the FEC as a result of its review of Governor Milton Shapp's submission for federal matching funds for his presidential primary campaign in 1976. The Presidential Primary Matching Payment Account Act (Pub. L.No.94–283), Chapter 96 of Title 26 of the *United States Code*, 26 U.S.C. 9031 *et seq.*, requires a primary candidate to obtain financial support from the residents of at least 20 states, in amounts of no more than $250 per contributor. A candidate who has received over $5,000 in contributions from residents of 20 states or more becomes eligible for matching funds. The candidate is then required to certify to the federal agency overseeing this program, the FEC, that

these contributions have been received. Among the states Governor Shapp certified was Alabama, with $5,000 in contributions received, the minimum needed to qualify.

During its required review of listed contributions certified as matchable, the Commission learned that the employees of defendant Winfield Manufacturing Company (hereinafter "Winfield"), listed as contributors, had contributed funds supplied to them by defendants. Unable to reach a conciliation agreement with defendants, the F.E.C. then filed the complaint in this case, alleging that defendant Milton Weinsten, chief executive officer and sole shareholder of Winfield, a New York corporation in the business of manufacturing military uniforms for the federal government, directed a scheme whereby Winfield's corporate funds would be used to make those contributions. In sum, that scheme involved Weinsten telling the plant manager of the Winfield plant in Alabama, Hugh Walker, that the Shapp campaign needed $2,000 in contributions in amounts of no more than $250 per individual, that the manager should distribute funds among various Winfield employees, that the manager and these employees and their spouses should then write checks to the Shapp campaign for these amounts, and that the company would reimburse the manager for the funds so contributed. Mr. Walker did this, and Winfield's check was then given to him.

The parties are in substantial agreement about the above-described facts.[1]

### First Amendment Issue

■ Defendants move to dismiss the complaint first on the ground that 2 U.S.C. §§ 441b, 441c and 441f (provisions of the F.E.C.A.) and their predecessors, are unconstitutional. The core of defendants' position is that § 441b is overly broad in prohibiting corporate political contributions in connection with enumerated political campaigns,[2] and therefore violates Winfield Corporation's First Amendment rights.[3]

The issues presented here have been the subject of decisions in this Circuit and in the Supreme Court which demonstrate the complexity of the competing considerations. In *United States v. Chestnut*, 394 F.Supp. 581 (S.D.N.Y.1975) (Weinfeld, J.), aff'd., 533 F.2d 40, 50–51 (2d Cir. 1976) the court upheld the predecessor of § 441b against a First Amendment attack on the ground that it was, *inter alia*, overbroad. The court of appeals found "no need to amplify further the district court's comprehensive analysis . . . " of the issues because it "agree[d] with both [Judge Weinfeld's] reasoning and conclusions." 533 F.2d at 50–51.

In *Chestnut*, 394 F.Supp. at 583, Judge Weinfeld noted that § 610 (the predecessor of § 441b), barring corporate contributions, has two main purposes: (1) "to avoid the deleterious influences on federal elections resulting from the use of money by those who exercise control over large aggregations of capital" *Id.* at 589, *quoting United States v. Auto. Workers*, 352 U.S. 567, 585, 77 S.Ct. 529, 1 L.Ed.2d 563; and (2) "to prevent corporate and union officials from using corporate or general union funds for political purposes without the consent of stockholders or union members." *Id.* at

1. The court's statement of the facts is adapted from the factual statement in the FEC's *Memorandum in Opposition to Defendants' Motion to Dismiss Complaint.*

2. In the case at bar, the alleged illegality was a series of political contributions made to the election committee of Milton Shapp in connection with a presidential primary. It is obvious that this case in no way presents the First Amendment rights relating to a free press.

3. In general, the First Amendment test to be applied where the Government prohibits speech related to the process of governing is: "the State may prevail only upon showing a subordinating interest which is compelling." *See Bates v. City of Little Rock*, 361 U.S. 516, 524, 80 S.Ct. 412, 417, 4 L.Ed.2d 480 (1963); *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, at 463, 78 S.Ct. 1163, 2 L.Ed.2d 1488. *See also Bellotti*, 98 S.Ct. at 1421. The Government must also employ means "closely drawn to avoid unnecessary abridgment . . .", *Buckley v. Valeo*, 424 U.S. 1, 25, 96 S.Ct. 612, 638, 46 L.Ed.2d 659 (1976), and "the burden is on the Government to show the existence" of the compelling interest. *Elrod v. Burns*, 427 U.S. 347, 362, 96 S.Ct. 2673, 2684, 49 L.Ed.2d 547 (1976).

590. Given the government's "substantial" interest in upholding the integrity of the electoral process, the court found that any overbreadth was not substantial, and that the statute met the "least drastic means test" by prohibiting only contributions or expenditures from corporate treasuries and general union funds.[4]

Subsequent to *Chestnut*, the Supreme Court decided *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) and *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978), which dealt with the First Amendment rights of individuals and corporations as affected by the Act and by a Massachusetts criminal act containing similar restrictions.

It appears to this court that the first issue to be addressed is whether *Buckley* or *Bellotti*, or the two taken together, require a different result here than that which obtained in *Chestnut*. The defendants have moved on the assumption that *Buckley* held that a limitation of First Amendment rights of individuals was the least drastic means to achieve the statutory objectives, and that *Bellotti* extended First Amendment protection to corporate expression. Therefore, defendants conclude that while a limitation on corporate contribution might be constitutional, the prohibition of the Act is not. The court does not accept this beguiling analysis and concludes that *Chestnut* still expresses the law in this Circuit.

*Bellotti* held unconstitutional a Massachusetts statute that forbade expenditures by banks and business corporations to influence the outcome of referenda, unless the underlying issue materially affected the property, business, or assets of the corporation. The court stated that the Massachusetts statute struck "at the heart" of the First Amendment's protection, to wit:

> The freedom of speech and of the press guaranteed by the Constitution embraces at the least the liberty to discuss publicly and truthfully all matters of public concern without previous restraint or fear of

subsequent punishment . . . Freedom of discussion, if it would fulfill its historic function in this nation, must embrace all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period.

*Bellotti*, 98 S.Ct. at 1415–16, *quoting Thornhill v. Alabama*, 310 U.S. 88, 101–102, 60 S.Ct. 736, 84 L.Ed. 1093 (1940).

In *Bellotti*, however, the Court presumably anticipating an issue similar to that presented here, did not "survey the outer boundaries of the Amendment's protection of corporate speech, or address the abstract question whether corporations have the full measure of rights that individuals enjoy under the First Amendment." 98 S.Ct. 1407, 1416 (footnote omitted). Indeed, the Court went out of its way to indicate that it made no holding regarding the constitutionality of the very statutes herein being considered. Distinguishing between statutes which prohibit corporate contributions and expenditures to influence voting on *ballot questions* on the one hand, and, on the other hand, statutes which proscribe corporate contributions or expenditures to promote the *election* to public office of particular candidates, the Court stated in a footnote:

> Appellants do not challenge the constitutionality of laws prohibiting or limiting corporate contributions to political candidates or committees, or other means of influencing candidate elections. *Cf. Pipefitters Local No. 562 v. U. S.*, 407 U.S. 385, 92 S.Ct. 2247, 33 L.Ed.2d 11 (1972); *United States v. United Auto. Workers*, 352 U.S. 567, 77 S.Ct. 529, 1 L.Ed.2d 563 (1957); *United States v. CIO*, 335 U.S. 106, 68 S.Ct. 1349, 92 L.Ed.2d 1849 (1948). About half of these laws, including the *Federal Corrupt Practices Act, 2 U.S.C. § 441b, by their terms, do not apply to referendum votes*.

   *      *      *      *

The overriding concern behind the enactment of statutes such as the Federal Cor-

---

4. *See also Kusper v. Pontikes*, 414 U.S. 51, 59, 94 S.Ct. 303, 38 L.Ed.2d 260 (1973); *Shelton v.* *Tucker*, 364 U.S. 479, 488, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960).

rupt Practices Act was the problem of corruption of elected representatives through the creation of political debts. *See United States v. International Union United Auto. Workers, supra,* 352 U.S., at 570–575, 77 S.Ct., at 530–533; *Schwartz v. Romnes,* 2 Cir., *supra,* 495 F.2d 844, at 849–851. The importance of the governmental interest in preventing this occurrence has never been doubted. The case before us presents no comparable problem, and our consideration of a corporation's right to speak on issues of general public interest implies no comparable right in the quite different context of participation in a political campaign for election to public office.

. . . . .

*Bellotti,* 98 S.Ct. at 1422, n. 26 (emphasis supplied). The Court went on to state that "Referenda are held on issues, not candidates for public office. The risk of corruption perceived in cases involving candidate elections . . . simply is not present in a popular vote on a public issue." 98 S.Ct. at 1423 (footnote omitted).

Defendants, however, refer to Justice White's dissenting opinion in *Bellotti,* 98 S.Ct. 1430, especially at 1439. Notwithstanding the *Bellotti* majority's disclaimers, Justice White asserts that "the analytical framework employed by the Court clearly raises doubt about the Corrupt Practices Act." 98 S.Ct. at 1439 (White, J., dissenting). Because the majority identified the central question in *Bellotti* as "whether the corporate identity of the speaker deprives this proposed speech of what otherwise would be its clear entitlement to protection," 98 S.Ct. at 1416, and because *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) had held that "preventing corruption is insufficient to justify restrictions upon *individual* expenditures relative to candidates for political office", 98 S.Ct. at 1439 (White, J., dissenting) (emphasis supplied), Justice White concluded the two majority decisions taken together "reserve the formal interment of the Corrupt Practices

Act and similar state statutes for another day." *Id.* at 1439.

*Buckley* indicates the importance of the distinction between "expenditures" and "contributions." *See Buckley,* 424 U.S. at 14, *et seq.,* 96 S.Ct. 612, 632. Although *Buckley* found unconstitutional a statutory provision [5] which limited individual *expenditures* "relative to a clearly identified candidate" to $1,000 per candidate per election, the Court found that a $1,000 limitation [6] on individual *contributions* was a reasonable limitation on First Amendment rights. In making this distinction the Court noted that contributions pose special problems: (1) "To the extent that large contributions are given to secure a political *quid pro quo* from current and potential officeholders, the integrity of our system of representative democracy is undermined. Although the scope of such pernicious practices can never be reliably ascertained . . . the problem is not an illusory one", 424 U.S. at 26–27, 96 S.Ct. at 638 (footnote omitted); and (2) "Of almost equal concern as the danger of actual *quid pro quo* arrangements is the impact of the *appearance* of corruption stemming from public awareness of the opportunities for abuse inherent in a regime of large individual financial contributions." 424 U.S. at 27, 96 S.Ct. at 638 (emphasis supplied).

Although Congress has determined that a $1,000 ceiling on individual contributions adequately furthers the goals of preventing the appearance of corruption, etc., it does not necessarily follow that a similar ceiling is appropriate for corporate contributions.

While this court could rely solely on *Chestnut* and the Supreme Court's footnote quoted above (specifically eschewing the issue of absolute prohibition of corporate contributions presented here), candor and completeness, as well as Justice White's compelling dissent in *Bellotti,* require further analysis. This is particularly true with respect to Judge Weinfeld's determination in *Chestnut* regarding the least drastic means test.

---

5. § 608(e)(1) of the Federal Election Act at 1971, as amended in 1974.

6. *See* § 608(b) of the Federal Election Act of 1971, as amended in 1974.

Regardless of the logical interplay of *Buckley* and *Bellotti*, this court concludes that if this issue reaches the Supreme Court, the prohibition of the Act on contributions will be upheld because of the essential nature of "free speech" and of the present speaker, a corporation doing business with the government.

For this court to elaborate on the nature of free speech would be presumptuous in view of the exhaustive literature in this field and the opinions already referred to. However, its essential characteristic is adverted to in Justice White's dissent: the First Amendment is intended to foster "the use of communication as a means of self-expression, self-realization and self-fulfillment . . . ." 98 S.Ct. at 1431 (White, J., dissenting).

In this court's view, the making of a political contribution by an individual is a means of self-expression which is directly linked to that individual's right to vote. Thus the Supreme Court has held that Congress may not restrict an individual's political expenditures and that it may not totally prohibit individual contributions. *Buckley v. Valeo, supra.* Corporate expenditures or contributions, however, are a distinguishable form of speech. Such speech is outside the usual range of corporate purposes and does not purport to express the views of shareholders. A corporation, which is a creature of state law, may expend its resources to speak on particular issues. *See Bellotti.* The right to self-expression, however, does not extend to corporate financial contributions. Such contributions by themselves say little, but given the realities and expense of modern communications they may permit the indirect purchase of votes. To permit even small political contributions by corporations would alter the structure and presentation of political issues. Instead of encouraging individual free speech, the allowance of corporate contributions would obscure it.

This danger is heightened by the aggregation of economic power possessed by the modern corporation, too evident to require demonstration.[7] This economic strength is permitted and regulated by law in terms of the factors considered by Justice White: viz. limited liability; perpetual life; and the accumulation, distribution, and taxation of assets. Up to this time, this power has been considered by the legislators to be insulated from the political process. Given the nature of free speech, this court agrees with Judge Weinfeld that the absolute prohibition of corporate contributions constitutes the least drastic means to achieve the Congressional goal of protecting the integrity of the political process. It is difficult to imagine an area of public concern where a legislative decision should be entitled to greater weight. Judicial interpretation of the First Amendment should not sweep over the Congressional prohibition of corporate contribution to political campaigns.

Defendants next assert that § 441c, which prohibits certain political contributions by government contractors, abridges their First Amendment rights. The considerations set forth above with respect to § 441b are controlling on this issue. Therefore, the court holds that § 441c does not violate the free speech guarantees of the First Amendment.[8]

Defendants' final constitutional attack is that 2 U.S.C. § 441f, which outlaws making of political contributions in the name of another, is unconstitutionally

---

7. The Congressional prohibition of corporate contributions must be assumed to have its roots in the excesses of the corporate manipulation of the political process demonstrated in the late nineteenth century and early twentieth century by the rivalry of Jay Gould and Commodore Vanderbilt. *See generally* S. Morison, *The Oxford History of The American People* at 730 (1965); Enforcement Act of 1870, 16 Stat. 63; Tillman Act of 1907, 34 Stat. 864.

8. The court's analysis actually applies *a fortiori* as regards § 441c because: (1) there is a greater likelihood that the public will perceive corrupt relationships between elected officials and corporations when those corporations have previously received Government contracts; and (2) because § 441c applies only to a subset of the corporations affected by § 441b, § 441c is more narrowly drawn than is § 441b.

vague. The test for vagueness is whether persons "of common intelligence must necessarily guess at [the statute's] meaning and differ as to its application." *See Connally v. General Construction Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). For the purposes of this motion it is assumed that defendant Weinsten directed his plant manager to make funds available to employees of Winfield so that those employees could send individual checks to the Shapp election committee. Defendants made those funds available to the manager. These acts demonstrate that defendants did comprehend the simple words: "No person shall make a contribution in the name of another person." 2 U.S.C. § 441f. In any case, the court finds no ambiguity in the statutory language.

### Appropriateness of Civil Damages

At the time defendants allegedly committed the acts involved herein, the relevant sections of the Act were found at 18 U.S.C. §§ 610, 611, and 614. The only civil penalty expressly provided by the Act for violations of these sections was injunctive relief. *See* Pub.L. 92–225, Title III, § 314, as added Pub.L. 93–443, Title II, § 208(a), October 15, 1974, 88 Stat. 1284, 2 U.S.C. § 437g(a)(7). On May 11, 1976 §§ 610, 611, and 614 were repealed by Pub.L. 94–283. The substance of these provisions, however, was incorporated into 2 U.S.C. §§ 441b, 441c, and 441f. Whereas the pre-1976 law made no provision for civil damages, the post-1976 Act provides that:

> In any civil action for relief instituted by the Commission under paragraph (5), if the court determines that the Commission has established through clear and convincing proof that the person involved in such civil action has committed a knowing and willful violation of this Act or of chapter 95 or chapter 96 of Title 26, the court may impose a civil penalty of not more than the greater of (A) $10,000; or (B) an amount equal to 200 percent of the contribution or expenditure involved in such violation.

2 U.S.C. § 437g(a)(7). The defendants urge that application of the new civil damages provision would violate the *ex post facto* clause of the Constitution. U.S. Constitution, Art. I, § 9, cl. 3.

The *ex post facto* clause applies to statutes which impose or increase criminal punishment for acts committed prior to their enactment. *Harisiades v. Shaughnessy*, 342 U.S. 580, 594, 72 S.Ct. 512, 96 L.Ed. 586 (1951). On its face, the post-1976 statute indicates that it empowers the court to "impose a civil penalty" in an appropriate "civil action". *See* 2 U.S.C. § 437g(a)(7). Notwithstanding the language of the Act, defendants argue that the penalties involved are, in the words of counsel, "quasi criminal" in nature.

The only authority cited by counsel in support of this theory is *United States v. An Article of Food (Swordfish)*, 395 F.Supp. 1184 (S.D.N.Y.1975). In dictum, that court remarked that the *ex post facto* provision might apply to statutes which apply "civil disabilities which are really criminal penalties in disguise." *Id.* at 1187. The court held, however, that Federal Food, Drug, and Cosmetic Act provisions like those which authorized seizure of food containing poisonous substances were regulatory, not penal, so that the *ex post facto* prohibition was inapplicable.

In *DeVeau v. Braisted*, the Supreme Court was presented with an *ex post facto* attack on § 8 of the Waterfront Commission Act, and laid out the applicable principles of law:

> The mark of an *ex post facto* law is the imposition of what can fairly be designated punishment for past acts. The question in each case where unpleasant consequences are brought to bear upon an individual for prior conduct, is whether the legislative aim was to punish that individual for past activity, or whether the restriction of the individual comes about as a relevant incident to a regulation of a present situation, such as the proper qualifications for a profession. *See Hawker v. New York*, 170 U.S. 189, 18 S.Ct. 573, 42 L.Ed. 1002.

363 U.S. 144, at 160, 80 S.Ct. 1146, at 1155, 4 L.Ed.2d 1109.[9]

Defendants have cited no cases applying these principles in the manner they suggest. Indeed, what precedent there is goes in the opposite direction. For example, in *Reetz v. Michigan*, the Supreme Court found that a regulatory statute purporting to disallow the continued practice of medicine by a previously licensed physician was not "punishment" for a past offense, and therefore did not violate the *ex post facto* clause. 188 U.S. 505, 23 S.Ct. 390, 47 L.Ed. 563 (1903). In *Harisiades v. Shaughnessy*, 342 U.S. 580, 72 S.Ct. 512, 96 L.Ed. 586 (1951) the Court rejected an *ex post facto* attack on the Alien Registration Act of 1940, which authorized the deportation of a legally resident alien because of membership in the Communist Party, even though such membership terminated before enactment of the Act. In rejecting what apparently was a "quasi-criminal" argument similar to the one now presented, the Court remarked:

> However, even if the [Alien Registration] Act were found to be retroactive, to strike it down would require us to overrule the construction of the *ex post facto* provision which has been followed by this Court from earliest times. It always has been considered that that which it forbids is penal legislation which imposes or increases criminal punishment for conduct lawful previous to its enactment. Deportation, however, severe its consequences, has been consistently classified as a civil rather than a criminal procedure. Both of these doctrines as original proposals might be debatable, but both have been considered closed for many years and a body of statute and decisional law has been built upon them. In *Bugajewitz v. Adams*, 228 U.S. 585, 591, [33 S.Ct. 607, 57 L.Ed. 978], Mr. Justice Holmes, for the Court, said: "It is thoroughly established that Congress has power to order the deportation of aliens whose presence in the country it deems hurtful. The determination by facts that might constitute a crime under local law is not a conviction of crime, nor is the deportation a punishment; it is simply a refusal by the government to harbor persons whom it does not want. The coincidence of the local penal law with the policy of Congress is an accident. . . . The prohibition of *ex post facto* laws in article I, § 9, has no application . . . and with regard to the petitioner, it is not necessary to construe the statute as having any retrospective effect." Later, the Court said, "It is well settled that deportation, while it may be burdensome and severe for the alien, is not a punishment. . . . The inhibition against the passage of an *ex post facto* law by Congress in § 9 of article I of the Constitution applies only to criminal laws . . . and not to a deportation act like this. . . ." *Mahler v. Eby*, 264 U.S. 32, 39, [44 S.Ct. 283, 68 L.Ed. 549].
> It is urged against the foregoing opinions that in a few cases the *ex post facto* prohibition had been applied to what appeared to be civil disabilities. *Fletcher v. Peck*, 6 Cranch 87, [3 L.Ed. 162]; *Cummings v. Missouri*, 4 Wall. 277, [18 L.Ed. 356]; *Ex parte Garland*, 4 Wall. 333, [18 L.Ed. 366]; *Pierce v. Carskadon*, 16 Wall. 234, [21 L.Ed. 276]. The Court has since explained that those cases proceeded from the view that novel disabilities there imposed upon citizens were really criminal penalties for which civil form was a disguise. *Burgess v. Salmon*, 97 U.S. 381, 385, [24 L.Ed. 1104]. Those cases were known to the Justices who promulgated the above-quoted opinions but have never been considered to govern deportation. The facts of this case afford no basis for reconsidering or modifying the long-settled doctrine.

342 U.S. at 594–95, 72 S.Ct. at 521.

Especially in light of the fact that defendants admitted at oral argument that

---

9. The Court went on to state: "No doubt is justified regarding the legislative purpose of § 8. The proof is overwhelming that New York sought not to punish ex-felons, but to devise what was felt to be a much-needed scheme of regulation of the waterfront, and for the effectuation of that scheme it became important whether individuals had previously been convicted of a felony."
363 U.S. at 160, 80 S.Ct. at 1155.

they have no substantial precedent adopting their position, Congress' language is dispositive and the penalties imposed by FEC are held to be civil in nature.[10]

### Appropriateness of Injunctive Relief

In determining whether an injunction should issue, the critical question for the court is whether there is "a reasonable likelihood that the wrong will be repeated." *S.E.C. v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1100 (2d Cir. 1972). Cessation of the illegal activity, however, does not *ipso facto* justify denial of an injunction. *United States v. Parke, Davis & Co.*, 362 U.S. 29, 47–48, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960). Furthermore, "past violations may in certain circumstances justify an inference that a defendant is likely to violate the law in the future if not enjoined." *Securities & Exch. Com'n. v. Management Dyn., Inc.*, 515 F.2d 801, 807 (2 Cir. 1975). Furthermore, for purposes of this motion, the complaint may not be dismissed for failure to state a claim unless it is beyond doubt that plaintiff can prove no set of facts entitling it to relief. *See Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). With these principles in mind the court holds that plaintiff's demand for injunctive relief must not be dismissed.

### Conclusion

For the above-described reasons, defendants' motion to dismiss the complaint is denied on all grounds.

IT IS SO ORDERED.

---

**10.** *See generally Citronelle-Mobile Gathering v. Gulf Oil Corp.*, 420 F.Supp. 162 (D.C.Ala.1976), wherein that court found that Section 3 of the Emergency Petroleum Allocation Act of 1975 does not violate the *ex post facto* clause because: "Section 3 of the EPAA of 1975 directly expresses the intent of Congress that said statute is non-penal and Citmoco faces no possible consequences from the FEA which can be deemed criminal in nature. This court finds that Citmoco's allegation that the subject legislation violates the Ex Post Facto Clause of the United States Constitution is not well taken." 420 F.Supp. at 170.