FEDERAL ELECTION COMMISSION,
Plaintiff,

v.

NATIONAL RIGHT TO WORK COM-
MITTEE et al., Defendants.

NATIONAL RIGHT TO WORK
COMMITTEE et al., Plaintiffs,

v.

FEDERAL ELECTION COMMISSION
et al., Defendants.

Civ. A. Nos. 77–2175, 78–0315.

United States District Court,
District of Columbia.

April 24, 1980.

Lawrence M. Noble, Patricia Bak, Washington, D. C., for Federal Election Commission.

Alan P. Dye, MacKenzie Canter, III, Washington, D. C., Richard J. Clair, Fairfax, Va., Conrad Harper, New York City, for National Right to Work Committee and Employee Rights Campaign Committee.

## MEMORANDUM OPINION

BARRINGTON D. PARKER, District Judge:

The Federal Election Campaign Act of 1971, (FECA or Act) 2 U.S.C. § 431 *et seq.*, establishes an intricate statutory scheme governing federal election campaigns. It imposes restrictions on political contributions and expenditures which apply to all phases of and participants in the election process. The Supreme Court has observed that the primary purpose of the statute is "to limit the actuality and appearance of corruption resulting from large individual financial contributions" in federal elections. *Buckley v. Valeo*, 424 U.S. 1, 26, 96 S.Ct. 612, 638, 46 L.Ed.2d 659 (1976) (per curiam).

These consolidated cases[1] challenge the constitutionality and application of provisions of the Act, section 441b(b)(4)(A) and (C), which forbid a corporation without capital stock to solicit contributions from persons other than its members. The controversy arises from the Federal Election Commission's (FEC or Commission) charge that in 1976, the National Right to Work Committee (NRWC or Committee), unlawfully solicited contributions from persons who were not members of that organization. NRWC maintains that it has complied with the statute, or in the alternative, that the restrictions imposed are either void for vagueness or an unconstitutionally overbroad restriction on First Amendment rights.

The underlying material facts are not disputed. The parties have filed cross-motions for summary judgment. The legal memoranda, the various exhibits, submissions and the argument of counsel have been considered. The Court concludes that, as applied to NRWC, the statutory provisions in question are neither unconstitutionally vague nor overbroad, and that NRWC has violated the Act by soliciting persons who are not members of that organization.

## I. BACKGROUND

### A. The Structure of the National Right to Work Committee

The NRWC is a non-profit corporation without capital stock incorporated under the laws of Virginia. Its stated purposes as set out in the articles of incorporation are "[t]o help make the public aware of the fact that American citizens are being required, against their will, to join and pay dues to labor organizations in order to earn a living," and that compulsory unionism violates fundamental rights.

The essential features of its structure and method of operations have been stipulated to or are otherwise clearly defined by discovery. The Committee's articles of incorporation specifically provide that it shall not have members. A board of directors is authorized to govern and manage the corporate affairs. The board is self-perpetuating; new directors are elected by majority vote of the existing board of directors. The initial board members were named directly in the articles of incorporation.

NRWC's concept of membership is elusive, at best. The Committee's bylaws contain no reference to members or membership and make no reference to any standards or criteria for membership or any rights or obligations of members. No formal corporate papers exist which describe the rights, duties, and benefits of membership in NRWC.

From 1971 through at least 1974, NRWC claimed before the Internal Revenue Service a tax exempt status as a social welfare organization. In response to a question put on federal tax forms requiring membership organizations to enter the amount allocated for political purposes, NRWC either left the space provided for response blank or filled the space with the response of "N/A." However, in a deposition filed earlier in a different proceeding before this District Court, Reed Larson, President of NRWC, stated that the "Committee acknowledges contributions as members." He added that the additional Internal Revenue Service forms required to be filed by membership organizations indicating the amounts allocated to political purposes were never filed because NRWC had no political expenditures and because it was not a membership organization.[2]

Despite these conflicting representations the Committee claims a membership in excess of 1 million persons. This claimed membership strength is built on solicitations addressed to potential supporters of its mission. To locate such supporters, it buys, rents and otherwise obtains mailing

1. For a discussion of the consolidated cases see pages 427 428 *infra.*

2. Deposition of Reed Larson, March 19, 1974, 712–14, *UAW v. National Right to Work Legal Defense Fund and Educational Foundation,* Civil Action No. 839–73 (D.D.C. filed May 1, 1973).

lists. Letters are then sent to individuals on the lists. These "membership solicitation letters" are frequently written on the letterhead stationery of a Member of Congress and signed by the addressor Congressman or Senator. While the letters are ostensibly sent to persons sympathetic to the Committee's cause, because of the source of the addressee's name, this cannot be definitely determined in advance.[3] The "membership solicitation letters" are initiated by the NRWC on a regular basis and in large numbers. The record shows for example that within a one–month period, late December, 1977 to mid January, 1978, the Committee sent eight million copies of one such form letter to members of the general public.

A typical letter explains the evils of compulsory unionism and outlines NRWC's efforts to combat it through legislative action. A questionnaire is enclosed with the letter, posing general inquiries about the reader's attitude toward compulsory unionism. A space is included in the questionnaire where a person may indicate the amount of any contribution, followed by a statement that the contribution will be used to compile and publish the results of the questionnaire or to secure the passage or defeat of a particular piece of legislation.

The letters and the questionnaire do not invite the recipient to join nor do they discuss any aspect of membership in the NRWC. Indeed, nothing is recited as to how a recipient may accept or become a member.[4] Nonetheless, recipients who respond favorably to the inquiries, which counsel for NRWC admitted are framed to elicit favorable responses, are then sent membership cards. The questionnaires vary from mailing to mailing, and the standards regarding correct responses needed to qualify for membership are set by NRWC's president, who passes them on to the Membership Director. NRWC admits that these standards are seldom, if ever, put in writing.

The Committee recognizes two classes of "members": those who respond to the questionnaire and contribute money are deemed "active members"; those who merely respond to the questionnaire without a contribution are classified as "supporting members." On the approximate anniversary of their last donation to NRWC, all past contributors (active members) receive a new membership card and a renewal notice thanking them for their past support and requesting an additional contribution. Those who do not respond receive a second, and if necessary, a third notice. Even if these appeals are unanswered, the unresponsive are maintained on NRWC's rolls as "active members." Those who fail to contribute for two successive years are reduced in status to "supporting members." Such a member apparently retains that status indefinitely without taking any affirmative steps.

On the basis of this method of "membership" procurement, NRWC claims a total of 1.25 million members and an increase in its membership by 750,000 persons in the one–year period, March 1975–March 1976. In the election year of 1976, NRWC spent over $1 million in soliciting persons to become "members" or "renew" their "membership"

---

3. *See* Transcript of Hearing on Cross–motions for Summary Judgment, November 19, 1979 at 57.

4. *See* Joint Exhibit Binder (JEB) Ex. 33–38. One letter and questionnaire sent out in January 1977, after the solicitations at issue here, was accompanied by a sheet entitled "The National Right to Work Committee (Questions and Answers)" containing additional information about NRWC. In response to questions posed therein, the Committee claims to have (at that time) "700,000 supporters nationwide, almost half of whom have made contributions in the past twelve months." In response to the question "How much does it cost to join [the NRWC]?" the Committee explains "The members ... contribute whatever they can afford. Some people contribute hundreds of dollars each year. The average new member contributes just over twelve dollars." The Committee identifies its members as "men and women in all walks of life, union members as well as non–union employees from every corner of America–who, through their voluntary contributions, support the work of the Committee." The letter and questionnaire accompanying this sheet *do not mention membership* in NRWC. JEB Ex. 35.

in NRWC. To terminate affiliation a person must contact the Committee and request to be removed from the membership lists. Those who do so are sent a letter asking them to reconsider, and in the event that they still wish to drop their membership, to complete and return an enclosed form. If the NRWC receives no response to this appeal, the person's name is stricken within "probably, four weeks" of the initial request. None of the foregoing procedures or distinctions has ever been described in the materials mailed to present or prospective members. Nor have they been included in the articles of incorporation or by-laws of the NRWC.

### B. The Alleged Violations of FECA

The Federal Election Campaign Act restricts corporate financial participation in the electoral process. Section 441b(a) forbids a corporation from making a contribution or expenditure of money in connection with a federal election. Section 441b(b)(4)(A)(i) provides that a corporation may expend money to solicit political contributions to its separate segregated fund but only from its stockholders and its executive and administrative personnel and the families of those persons. In addition section 441b(b)(4)(C) provides that a corporation without capital stock may expend money to solicit political contributions to its separate segregated fund from its members.[5]

On December 30, 1975 in an effort to comply with the statute, the NRWC established a separate entity, the Employee Rights Campaign Committee (ERCC) which is also a defendant in this case. This organization, controlled by NRWC, served as a separate segregated fund empowered to accept contributions and make expenditures on behalf of candidates for public office who shared NRWC's philosophy. On January 6, 1976, the NRWC formally requested the Federal Election Commission to issue an advisory opinion as to whether NRWC or ERCC could lawfully solicit contributions

from "active members or supporting members of the National Right to Work Committee." Although the letter mentioned the distinction between active and supporting members, it did not reveal that NRWC's corporate charter expressly provided that the Committee had no members, nor did it explain the membership process in any detail. Later that month, on January 30, before the Commission acted on the request, the Supreme Court invalidated the means of appointing Federal Election Commissioners, thus forestalling the issuance of formal advisory opinions. *Buckley v. Valeo*, 424 U.S. at 140–43, 96 S.Ct. at 692–693.

Amendments to the Act curing the constitutional defects in the appointment process became effective May 11, 1976.[6] Four days prior to that date, however, on May 7, NRWC mailed over 34 thousand letters soliciting contributions to ERCC to be used to support candidates in the 1976 elections. In June an additional 35 thousand persons were solicited and from September 9 through 15, NRWC contacted nearly 198 thousand persons in similar solicitations.

The letters mailed during the five-month period warned the recipient that organized labor was threatening to make major gains in the 1976 congressional elections. Signed by an officer of the ERCC, the letters sought contributions to be used to support congressional and senatorial candidates who agreed with NRWC philosophy and political goals. In all, NRWC contacted approximately 267 thousand persons and raised $77,474. Both NRWC and ERCC concede that none of those persons solicited between May 7, and September 15, 1976 were stockholders of NRWC or known to be executive or administrative personnel of NRWC or the families of such persons. Rather they claim that NRWC is a corporation without capital stock with members and that the persons solicited in 1976 were members of NRWC. ERCC filed all the necessary disclosure reports with the FEC, including the

---

5. For a full discussion of the relevant provisions of the Act see Part 1–C *infra*.

6. Federal Election Campaign Act Amendments of 1976, Pub.L.No. 94–283, §§ 101, 108, 90 Stat. 475, 482 (1976) (codified at 2 U.S.C. §§ 437c, 437f).

names of those who contributed over $100.00.

Meanwhile, on May 26, a reconstituted Commission published proposed general regulations pursuant to the new Act and invited public comment. The regulations included a proposed definition of "members."[7] On June 22, the FEC advised NRWC that in light of the proposed rules, the NRWC's advisory opinion file would be closed. The letter however, invited NRWC to request an opinion as to the regulations and the statute if the proposed regulations did not satisfactorily cover a specific factual situation. NRWC renewed its request for an advisory opinion on August 31, without modifying the earlier application and without mentioning that in the interim it had mailed over 70,000 solicitation letters.

The FEC staff submitted a draft opinion to the Commission in late September, 1976. That draft was withdrawn, however, however when the staff acquired information which cast doubt on NRWC's claim to be a membership corporation.[8] Shortly thereafter, acting on a complaint brought by the National Committee for an Effective Congress, the FEC notified NRWC that there was "reason to believe" that NRWC had violated the Act by soliciting persons who were not members. An investigation was initiated by the Commission staff and in April, 1977, the Commissioners voted unani-

mously that there was reasonable cause to believe that a violation had taken place. The parties then engaged in informal conciliation conferences as required under the statute. Their conciliation efforts proved fruitless and on October 5, 1977, the Commissioners by a 6–0 vote authorized initiation of civil enforcement proceedings.

Alerted to the Commission's intention, NRWC struck first by filing on October 20, 1977, a complaint seeking injunctive and declaratory relief in District Court for the Eastern District of Virginia. The suit alleged that § 441b(b)(4)(C) of the Act, allowing solicitation of "members" was unconstitutionally vague; that the definition of "member" adopted by the FEC in its regulations and practice violated equal protection by favoring labor unions over non–stock corporations; and, that the FEC handling of the advisory opinion and the investigation offended due process.

One month later, the FEC filed an enforcement proceeding in this Court,[9] alleging that because of NRWC's articles of incorporation and actual structure, it was not entitled to the exemption under section 441b(b)(4)(C) which allowed non–stock corporations to solicit their members. As affirmative relief the Commission sought an order directing that ERCC and NRWC be required to refund all money unlawfully

---

**7.** The proposed regulations provided:

"Members" means all persons who are currently satisfying the requirements for membership in a membership organization, trade association, cooperative, or corporation without capital stock and in the case of a labor organization, persons who are currently satisfying the requirements for membership in a local, national, or international labor organization. Members of a local union are considered to be members of any national or international of which the local union is a part and of any federation with which the local national, or international union is affiliated. A person is not considered a member under this definition if the only requirement for membership is a contribution to a separate segregated fund.

41 Fed.Reg. 21,592 (1976) (codified at 11 C.F.R. § 114.1(e) (1979).

**8.** The staff was alerted to these facts during a meeting on September 28 or 29 with FEC Commissioner Harris at which Harris discussed the

proposed advisory opinion with two attorneys from the General Counsel's Office. At the meeting Harris expressed doubts whether NRWC was in fact a membership organization; it is uncertain whether he actually gave the staff lawyers copies of NRWC's articles of incorporation and a 1972 tax statement or merely told them of the documents existence. *See* Joint Stipulation of Facts (JSF) ¶ 21. In any event, one week after the meeting, the General Counsel's Office requested that NRWC provide additional information on its membership status.

**9.** The FEC complaint in this Court originally named another non–profit group, the Public Service Research Committee, and its political action committee, as defendants with NRWC. PSRC has since signed a consent decree with the FEC in which it agrees, *inter alia*, to modify its articles of incorporation to include standards for membership.

solicited and enjoining future solicitations in violation of federal election laws. In addition, substantial civil penalties were sought under section 437g. ERCC and NRWC answered and interposed as defenses the same constitutional claims raised in their suit for injunctive and declaratory relief.

The Eastern District of Virginia litigation has been transferred to this Court and consolidated with the Commission enforcement action. The parties have since conducted extensive discovery and agreed upon a comprehensive stipulation of facts supported by three volumes of exhibits. On the basis of this factual record, both parties have moved for summary judgment.

### C. Statutory Framework

As noted earlier, the Federal Election Campaign Act is designed to reduce "the actuality and appearance of corruption" in federal elections. One way in which the Act accomplishes this purpose is to limit the financial participation of corporations and labor unions in federal election campaigns. Congress, concerned about the "corroding effect of money employed in elections by aggregated power" has enacted a general prohibition against corporate and union spending in connection with federal elections.[10] Section 441b(a) provides that "[i]t is unlawful ... for any corporation whatever, or any labor organization to make a contribution or expenditure in connection with any ... [federal election]."[11] The terms "contribution or expenditure" are defined broadly to include "any direct or indirect payment, distribution, loan, advance, deposit, or gift of money, or any services, or anything of value ...."[12]

10. *United States v. United Auto Workers*, 352 U.S. 567, 582, 77 S.Ct. 529, 537, 1 L.Ed.2d 563 (1957).

11. Section 441b(a) provides in full:

(a) It is unlawful for any national bank or any corporation organized by authority of any law of Congress, to make a contribution or expenditure in connection with any election to any political office, or in connection with any primary election or political convention or caucus held to select candidates for any political office, or for any corporation whatever, or any labor organization, to make a contribution or expenditure in connection with any election at which presidential and vice presidential electors or a Senator or Representative in, or a Delegate or Resident Commissioner to, Congress are to be voted for, or in connection with any primary election or political convention or caucus held to select candidates for any of the foregoing offices, or for any candidate, political committee, or other person knowingly to accept or receive any contribution prohibited by this section, or any officer or any director of any corporation or any national bank or any officer of any labor organization to consent to any contribution or expenditure by the corporation, national bank, or labor organization, as the case may be, prohibited by this section.

The prohibition contained in this section was originally codified at 18 U.S.C. § 610 and carried criminal penalties. The Federal Election Campaign Act Amendments of 1976 reenacted this section at 2 U.S.C. § 441b(a). Pub. L.No. 94–283, § 112, 90 Stat. 475, 486. The 1976 Amendments also gave the FEC the op-

tion of pursuing civil remedies on its own or referring the matter to the Attorney General for criminal prosecution. *Id.* at § 109, 90 Stat. 483–84; H.Rep.No. 94–917, 94th Cong., 2d Sess. 3–4 (1976).

NRWC's initial solicitation was made on May 7, 1976, four days before the proscription on corporate expenditures was reenacted in Title 2 and before civil penalties were provided for its violation. The FEC's requests for civil penalties as well as injunctive relief for the May 7 solicitations are nonetheless appropriate. Civil enforcement, in the nature of injunctive relief, was made available for violation of 18 U.S.C. § 610 by the Federal Election Campaign Act Amendments of 1974. Pub.L.No. 93–443, § 208, 88 Stat. 1263, 1284 (1974). Moreover, the imposition of civil penalties under FECA for what was a criminal offense at the time it was committed poses no constitutional questions. *FEC v. Weinsten*, 462 F.Supp. 243, 250–52 (S.D.N.Y.1978).

12. Section 441b(b)(2) provides in full:

(2) For purposes of this section and section 791(h) of title 15, the term "contribution or expenditure" shall include any direct or indirect payment, distribution, loan, advance, deposit, or gift of money, or any services, or anything of value (except a loan of money by a national or State bank made in accordance with the applicable banking laws and regulations and in the ordinary course of business) to any candidate, campaign committee, or political party or organization, in connection with any election to any of the offices referred to in this section, but shall not include (A) communications by a corporation to its

The general prohibition, however, is subject to a limited number of exceptions. One such exception allows corporations, labor organizations, membership organizations, cooperatives, and corporations without capital stock to establish, administer, and solicit contributions to "separate segregated funds to be utilized for political purposes." [13] These organizations, however, may not donate their own money to a fund to be spent for political purposes,[14] nor may they solicit contributions to these funds from the general public. They may solicit contributions only from limited classes of persons connected with the soliciting organization.

The Act allows solicitation in four situations: 1) corporations may solicit their stockholders and stockholders' families, and executive and administrative personnel and their families; 2) labor organizations may solicit their members and members' families;[15] 3) membership organizations, cooperatives, and corporations without capital stock may solicit their members;[16] and 4) trade associations may solicit the stockholders and executive and administrative personnel of their member corporations.[17] These provisions allowing limited solicitations by certain organizations are specific exceptions to the general prohibition against corporate and union spending in connection with federal elections.

## II. LEGAL ANALYSIS

The "membership exception" which allows membership organizations, cooperatives and corporations without capital stock to solicit their members, lies at the heart of this controversy. In its enforcement action, the FEC has alleged that NRWC, a corporation without capital stock, and ERCC, its separate segregated fund, have solicited contributions from persons who are not members of NRWC.

In their motion for summary judgment NRWC and ERCC raise four defenses against enforcement: 1) that the exemption for solicitations by membership organizations and non–stock corporations is unconstitutionally vague in that key terms are not defined in statute, regulations or advisory opinions; 2) that if the statute is construed broadly–as it must be in order to be constitutional–their solicitations fall within the ambit of the membership exception; 3) that the statutory provisions limiting corporate solicitations to certain classes of persons unconstitutionally abridges the rights to freedom of speech and association by restricting protected communications without a compelling government interest; 4)

stockholders and executive or administrative personnel and their families or by a labor organization to its members and their families on any subject; (B) nonpartisan registration and get–out–the–vote campaigns by a corporation aimed at its stockholders and executive or administrative personnel and their families, or by a labor organization aimed at its members and their families; and (C) the establishment, administration, and solicitation of contributions to a separate segregated fund to be utilized for political purposes by a corporation, labor organization, membership organization, cooperative, or corporation without capital stock.

**13.** 2 U.S.C. § 441b(b)(2)(C).

**14.** *See Pipefitters Local Union No. 562 v. United States*, 407 U.S. 385, 428–32, 92 S.Ct. 2247, 2271–2272, 33 L.Ed.2d 11 (1972).

**15.** 2 U.S.C. § 441b(b)(4)(A) provides:
(4)(A) Except as provided in subparagraphs (B), (C), and (D), it shall be unlawful—

(i) for a corporation, or a separate segregated fund established by a corporation, to solicit contributions to such a fund from any person other than its stockholders and their families and its executive or administrative personnel and their families, and
(ii) for a labor organization, or a separate segregated fund established by a labor organization, to solicit contributions to such a fund from any person other than its members and their families.

**16.** U.S.C. § 441b(b)(4)(C) provides:
(C) This paragraph shall not prevent a membership organization, cooperative, or corporation without capital stock, or a separate segregated fund established by a membership organization, cooperative, or corporation without capital stock, from soliciting contributions to such a fund from members of such organization, cooperative, or corporation without capital stock.

**17.** 2 U.S.C. § 441b(b)(4)(D).

that the FEC has violated due process in its treatment of the NRWC advisory opinion and investigation.

In its cross–motion, the FEC asserts that the statute is neither vague nor an unjustifiable interference with protected speech and that NRWC has violated the statutory limits on solicitation by corporations by soliciting persons who are neither stockholders, employees, or members of the corporation. The FEC also asserts that the NRWC violations were willful, so that substantial civil penalties are warranted.

### A. NRWC's Vagueness Argument

■ A statute is unconstitutionally vague where "men of common intelligence must necessarily guess at its meaning and differ as to its application . . . ." *Connally v. General Construction Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1925), quoted in *Cramp v. Board of Public Instruction*, 368 U.S. 278, 287, 82 S.Ct. 275, 280, 7 L.Ed.2d 285 (1961). Vague laws offend due process in that they fail to convey sufficiently definite warning of forbidden acts. They are particularly suspect where speech is involved. "[S]tricter standards of permissible statutory vagueness may be applied to a statute having a potentially inhibiting effect on speech; a man may the less be required to act at his peril here, because the free dissemination of ideas may be the loser." *Smith v. California*, 361 U.S. 147, 151, 80 S.Ct. 215, 217 (1959), quoted in *Hynes v. Borough of Oradell*, 425 U.S. 610, 620, 96 S.Ct. 1755, 1760, 48 L.Ed.2d 243 (1976). The Supreme Court has pointed out, however, in sustaining regulations imposed on political activities, that "there are limitations on being both specific and manageably brief, and . . . although the prohibitions may not satisfy those intent on find-

ing fault at any cost, they are set out in terms that the ordinary man using ordinary common sense can sufficiently understand and comply with . . . ." *Civil Service Commission v. National Association of Letter Carriers*, 413 U.S. 548, 578–79, 93 S.Ct. 2880, 2897, 37 L.Ed.2d 796 (1973) (upholding regulations promulgated under the Hatch Act). With these guidelines before it, the Court turns to consider NRWC's vagueness claims.

■ NRWC singles out four terms in section 441b(b)(4) as unconstitutionally vague: "solicit," "corporation without capital stock," "membership organization," and "member." The Committee argues that these terms are too imprecise to support the narrow reading the FEC places on the membership exception. After examining these terms in their statutory context and in light of their general legal connotations, the Court finds that these terms to be sufficiently precise to be applied in this action.

The term "solicit" poses no vagueness problems, even though it is not defined in the statute. It appears· in numerous federal statutes without elaboration as to its precise meaning. The Federal Corrupt Practices Act, 18 U.S.C. §§ 602–604, and the proxy provisions of the Securities Exchange Act of 1934, 15 U.S.C. § 78n provide two examples. In the case of the federal election laws, Congress understood "solicitation" to refer to "any action which could fairly be considered a request for a contribution." [18] Its context in the statute supports this definition: section 441b(b)(4)(A) makes it unlawful "to solicit contributions" to a separate segregated fund. Given the express requests for donations to ERCC contained in the 1976 mailings at issue here, the Committee can scarcely claim that its actions were not solicitations.[19] While the

---

18. 122 Cong.Rec. 12200 (1976) (remarks of Rep. Hays). Representative Hays was chairman of the House conferees for the Federal Election Campaign Act Amendments of 1976.

19. NRWC's reliance on *In re Primus*, 436 U.S. 412, 98 S.Ct. 1893, 56 L.Ed.2d 417 (1978) to demonstrate the vagueness of "solicitation" is misplaced. In *Primus* the Court reversed the reprimand of an ACLU lawyer who had written

a letter asking a welfare mother to join a suit against a physician who had sterilized her. The Court acknowledged that the letter was a solicitation, but held it was protected by the First and Fourteenth Amendments. 436 U.S. at 439, 98 S.Ct. at 1908. The Court did not find the Disciplinary Rule at issue vague, but rather overbroad in its application.

outermost boundaries of the word may be uncertain, NRWC's mailings plainly lie at the center rather than on the periphery of its meaning. No standing exists to challenge peripheral uncertainty when the acts in question lie at the heart of the statute's proscriptions. *Broadrick v. Oklahoma,* 413 U.S. 601, 608, 93 S.Ct. 2908, 2913, 37 L.Ed.2d 830 (1973).

Similarly, little question exists as to the meaning of the term "corporation without capital stock." The words express common legal concepts and NRWC demonstrated it understood them when it reincorporated in Virginia as a "corporation without capital stock" under that state's corporation code.[20]

The meaning of the terms "member" and "membership organization" present a closer question. NRWC argues that as they appear in the statute the words do not have a definite meaning which would allow the FEC to say that those persons who respond to the mailings and questionnaires are not members of NRWC, and that NRWC is not a membership organization.[21] Since, whenever possible, a statute should be construed to be constitutional,[22] the Committee contends that both terms must be given a broad reading–at least broad enough to encompass the relationship between NRWC and its supporters–or the statute will be void for vagueness. The Court, however, concludes that, as it appears in this statute, the term "members" has a narrower meaning which is apparent from the statute and its history, and from its general legal understanding.

The membership exception is part of section 441b(b)(4), which sets forth the limited situations under which certain organizations may finance solicitations for contributions to separate segregated funds. The situations described in paragraph (4) are exceptions to the general rule against corporate and union expenditures in connection with federal elections embodied in subsection 441b(a). The first two exceptions, which allow corporations to solicit their stockholders and labor unions their members, were first adopted in 1971, as part of an amendment proposed by Representative Hansen.[23] Congress enacted these exceptions to recognize that corporations and unions might owe "fiduciary" duties to their shareholders and members to undertake political activity to protect the organization's interests.[24] The limits on corporate and

---

**20.** Va.Stat.Ann. § 13.1–201 *et seq.*

**21.** NRWC apparently tries to claim the membership exception as both a corporation without capital stock *and* a membership organization, despite the declaration in its corporate charter that it is, under Virginia law, a corporation without capital stock. Since the Court finds that it has no members, its claim to be a "membership organization" also falls.

**22.** *Lynch v. Overholser,* 369 U.S. 705, 710–11, 82 S.Ct. 1063, 1067–1068, 8 L.Ed.2d 211 (1962).

**23.** This provision, currently codified at 2 U.S.C. § 441b(b)(2) was adopted as an amendment to 18 U.S.C. § 610, the general prohibition against corporate and union spending in federal elections. *See* note 12 *supra.* Since its enactment, it has been amended to allow membership organizations, cooperatives and corporations without capital stock to establish separate segregated funds.

**24.** Representative Hansen pointed out the obligation that organizations have to certain persons to undertake political activity:

First, every organization should be allowed to take the steps necessary for its growth and survival.... If an organization, whether it be the NAM, the AMA or the AFL–CIO, believes that certain candidates pose a threat to its well–being or the well–being of its members or stockholders, it should be able to get its views to those members or stockholders. As fiduciaries for their members and stockholders the officers of these institutions have a duty to share their informed insights on all issues affecting their institution with their constituents. Both union members and stockholders have the right to expect this expert guidance.

117 Cong.Rec. 43380 (1971).

The Supreme Court has noted that this "fiduciary" argument provides the basis for allowing limited solicitation by corporations and labor unions. *See Pipefitters Local No. 562 v. United States,* 407 U.S. 385, 431 n.42, 92 S.Ct. 2247, 2272, 33 L.Ed.2d 11 (1972).

Concerning the proper role of corporations and unions in election campaigns, Hansen stated:

At the present time there is broad agreement as to the essence of the proper balance in regulating corporate and union political activity required by sound policy and the Constitution. It consists of a strong prohibi-

union solicitation are now expressly provided in section 441b(b)(4)(A). The membership exception of 441b(b)(4)(C) at issue here was added in 1976, as was the trade association exception.

█ "Member" is not defined in the statute, and regulations and advisory opinions clarifying the term had not been adopted when NRWC and ERCC carried out their 1976 solicitations.[25] These interpretive aids, however, while helpful, are unnecessary in this case since the statutory scheme itself gives a clear indication of what is permitted and what is not. The membership exception is one of a series of exceptions to the no–solicitation rule. Corporations may solicit their shareholders; labor organizations their members. Given the strictures placed on these organizations it is clear that the membership exception must also be limited. Corporations without capital stock are permitted to solicit "members" who stand in a similar relation to non–stock corporations as shareholders stand to stock corporations and union members stand to labor unions. In other words, the term member should not be read to make the membership exception disproportionately broader or narrower than the shareholder exception or the union member exception. "Member" thus encompasses persons who have interests and rights in an organization similar to those of a shareholder in a corporation and a union member in a labor organization. To read the exception more broadly would be to upset the symmetry of the statutory scheme.

The legislative history of the membership exception confirms this limited definition of "member." There is certainly no indication that Congress intended to grant non–stock corporations the ability to solicit a broader class of persons than corporations with stock could solicit. Indeed, Senator Allen, sponsor of the amendment creating the membership exception, explained that the amendment was intended "to cure an omission" by allowing corporations without shareholders to solicit members who stood in their place. 122 Cong.Rec. 7198 (1976). During the floor debate the Senator added that "[t]his amendment was made necessary by the fact that certain types of corporations or organizations do not have stockholders." 122 Cong.Rec. 12468 (1976) (remarks of Senator Allen). In a subsequent colloquy with Senator Cannon, floor manager of the Federal Election Campaign Act Amendments of 1976, Senator Allen confirmed that the membership exception would apply to organizations such as mutual insurance companies, which had no shareholders but were instead comprised of policyholders. *Id.* at 12469. These remarks confirm what the face of the statute itself indicates; that in enacting the membership exception Congress intended to allow corporations without stock and membership organizations to solicit persons analogous to shareholders. There was no intent to create a loophole for mass solicitation based on purely philosophical affinity; only a desire to treat equitably organizations which do not fall neatly into the pre–existing union or stock corporation categories.

---

tion on the use of corporate and union treasury funds to reach the general public in support of, or opposition to, Federal candidates and a limited permission to corporations and unions, allowing them to communicate freely with members and stockholders on any subject, to attempt to convince members and stockholders to register and vote, and to make political contributions and expenditures financed by voluntary donations which have been kept in a separate segregated fund. This amendment writes that balance into clear and unequivocal statutory languages.
117 Cong.Rec. 43381 (1971), *quoted in Pipefitters*, 407 U.S. at 431, 92 S.Ct. at 2272.

**25.** The regulatory definition is quoted at footnote 7 *supra*. The FEC has also issued Advisory Opinion 1977–67 (June 28, 1978) which applies the statute and regulations to a specific factual situation. That opinion indicates that the FEC now requires organizations claiming the membership exception to have formal evidence of membership in corporate documents, some form of regular dues structure, and some procedure for members to express their views to the officers (although direct participatory rights are apparently not required). AO 1977–67 at 5.

Despite the clear import of the statute and legislative history, NRWC and ERCC protest that the term "member" is susceptible to such a broad range of meanings that, if the statute is to be constitutional, the term must include those who merely "associate" with the soliciting organization. The term is not as amorphous as they claim. Aside from the statute and legislative history, other sources indicate that "member" has a basic legal significance which is relevant in defining the scope of the statute.

For example, in *Hunt v. Washington Apple Advertising Commission*, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977), the Supreme Court looked to certain "indicia of membership" to determine whether a state promotional organization had standing to bring an action on behalf of the state's apple growers. Although the agency was not a trade association with members "in the traditional sense," the Court found that the growers "possess[ed] all the indicia of membership in an organization. They alone elect the members of the Commission; they alone serve on the Commission; they alone finance its activities . . . through assessments levied upon them." 432 U.S. at 344–45, 97 S.Ct. at 2442.

Similarly in a recent decision in this Court, *Health Research Group v. Kennedy*, 82 F.R.D. 21 (1979), Judge John Sirica applied these indicia to determine whether a public interest group had standing to represent purported "members" in a suit against the Food and Drug Administration. The court found that since the "members" did not contribute regularly and had no rights in selecting directors or formulating policy, they could not be considered members of the organization, even for purposes of giving that organization standing to represent them. 82 F.R.D. at 27.

While these indicia do not control the meaning of "member" for purposes of the Federal Election Campaign Act, they do provide guidance in defining the outer bounds of the term as it is used to describe the relationship of a person to an organization. When these indicia are combined with the context in which the term appears in the statute, the basic meaning of the term "member" becomes plain. At the least, it denotes a formal relationship in which a person, whether specifically described as a member or not, has specified rights and obligations vis–a–vis an organization. In addition, "membership" assumes some right to participate in the organization's direction, as well as an obligation to help support the organization through regular financial contributions.[26] Given this meaning, NRWC's and ERCC's challenge to the membership exception must fail. For "[e]ven if the outermost boundaries of [the statute] may be imprecise, any such uncertainty has little relevancy here, where [the] . . . conduct falls squarely within the 'hard core' of the statute's proscriptions . . . ." *Broadrick v. Oklahoma*, 413 U.S. at 608, 93 S.Ct. at 2914. Review of the undisputed facts demonstrates that, even using the generous "indicia" from *Hunt*, NRWC has no members and cannot bring itself within the membership exception.

### B. The Membership Exception Claim

■ The undisputed facts clearly demonstrate the weakness of NRWC's claim to the membership exception. Neither the corporate documents nor NRWC's relationship with its supporters substantiate the contention that it has members. The corporate charter provides explicitly that the organization "shall not have members." The filings with the Internal Revenue Service make the same representation. Nor do any formal corporate documents or the letters sent to prospective supporters describe the qualifications, rights, or obligations of NRWC's purported members.

It is also significant NRWC mailings do not inform a recipient that merely by returning a questionnaire with the proper answers, he or she will be claimed as a member. The letters and questionnaires contain

---

**26.** These standards are not inconsistent with those discussed in FEC Advisory Opinion 1977–

67. *See* note 25 *supra*.

no explicit invitation to become a member and could easily be interpreted as a survey rather than an application. Those who respond with properly completed questionnaires do receive membership cards, but even then, they are not informed as to what membership rights are bestowed, if any, at all.[27]

In addition to NRWC's failure to formally recognize members, its supporters do not possess any of the attributes of membership which could bring them within the exception. They clearly are not analogous to shareholders or union members. Although NRWC is funded by supporters, there is no obligation to contribute regularly. In fact, one can become and remain a member without contributing at all. Nor do NRWC's supporters exercise any control over the corporation's policy or management, other than in a highly indirect manner by refusing to contribute or by responding to an occasional questionnaire. In short the supporters possess none of the basic criteria of membership in an organization. The membership exception is simply unavailable to NRWC and ERCC. The 1976 solicitations were therefore prohibited corporate solicitations for contributions to a separate segregated fund in violation of the Federal Election Campaign Act, 2 U.S.C. § 441b(b)(4)(i).

■ In mitigation, NRWC and ERCC argue that the first solicitation, that of May 7, 1976, must be judged on a different standard. They point out that the membership exception was not enacted until May 11, 1976, and that prior to that, the statute contained no reference to corporations without capital stock or membership corporations. Relying on a letter written by then–Assistant Attorney General Richard Thornburgh commenting on a proposed advisory opinion, they argue that the statute then in effect did not prohibit non–profit corporations from soliciting persons sharing an "affinity of interest" with the corporation.[28] The May 7 solicitation, according to NRWC, was thus permissible.

NRWC and ERCC's argument misconstrues the structure of the Federal Election Campaign Act. The Act contains a broad prohibition against all types of corporate spending, subject to a limited number of exceptions. At the time of NRWC's first solicitation, the relevant exceptions allowed corporations to solicit only their stockholders and their families.[29] All other solicitations–including those sent by NRWC to its putative members–were prohibited corporate expenditures in connection with a federal election. Congress' enactment of a membership exception allowing certain organizations to solicit members implicitly confirms that such solicitations were not exempt before May 11, 1976. NRWC's first solicitation must therefore also be considered a violation, since as a corporation, it was subject to the Act's express prohibition in effect at that time.

NRWC and ERCC are no strangers to the federal election laws. They have been represented by the same counsel in FEC matters since well before their initial request for an advisory opinion in January, 1976.[30] Through knowledgeable counsel they have participated in lobbying activity before the FEC concerning the very statutory provisions involved in this case, and have exhibited a thorough familiarity with the Act's legislative history.[31] Given this knowledge

27. Even some of those NRWC claims as members seem to have their doubts about their relationship to the Committee. In the course of discovery, the FEC deposed eleven of NRWC's largest contributors; persons who NRWC claimed as "active members" by NRWC's standards. Of these eleven, at least four expressed doubt as to whether they were members. Others were unsure whether they were "active" or "supporting" members. JSF ¶¶ 73–83.

28. Reply of NRWC and ERCC to Motion of FEC for Summary Judgment at 34.

29. See footnotes 12, 23 supra.

30. See Minutes of Meeting of Executive Committee of NRWC, August 8, 1975 at 3, JEB Ex. 58.

31. See Letter of October 22, 1975 from George Webster to FEC Chairman George Harris commenting on Advisory Opinion 1975–23. Separate Exhibit Binder of FEC, Ex. A; Deposition of Alan Dye, March 30, 1979 at 9–10.

their misapplication of the membership exemption was hardly inadvertent.

NRWC was deliberately organized without members to avoid compliance with requirements imposed on bona fide membership corporations.[32] Moreover, it failed to grant its members any of the privileges normally associated with formal membership in an organization. In light of these explicit and implicit disavowals of membership, invocation of the membership exception is disingenuous. In addition, the Court notes that all the facts relevant to NRWC's advisory opinion request were never revealed. NRWC's initial request failed to reveal that its articles specifically precluded members.[33] When it renewed its request, NRWC failed to mention that it had already solicited nearly 70,000 persons.[34] The Committee also failed to inform the FEC that the proposed opinion was based on the erroneous presumption that NRWC formally recognized members in its articles.[35] FEC did not get copies of the articles until after the administrative complaint had been filed and FEC asked for them in a request for production of documents.[36] The details of NRWC's membership categories and selection process apparently did not surface until the FEC undertook discovery in this lawsuit.[37]

█ From all these facts it appears that NRWC and ERCC were well aware that they could not qualify for any of the exceptions. They nonetheless proceeded to solicit persons who were not members of NRWC while at the same time concealing from the

regulatory agency the true nature of this relationship. Under these circumstances, the Court concludes that there is clear and convincing proof that the violations were "knowing and willful" so as to merit the substantial penalties provided in section 437g(a)(7).[38] This provision has only recently been interpreted by the Court of Appeals for this Circuit to require a finding of " 'defiance' or 'knowing, conscious, and deliberate flaunting' [sic] of the Act." *AFL–CIO v. FEC*, 628 F.2d 98, 101 (D.C.Cir.1980), quoting *Frank Irey, Jr., Inc. v. OSHA*, 519 F.2d 1200, 1207 (3d Cir. 1975). Where the violation results from a "good faith" mistake and not from intentional wrongdoing, the heavier penalties provided for a section 437g(a)(7) violation are not appropriate. *Id.*, 628 F.2d at 102. The record in this case, however, provides ample proof of a more deliberate violation. Two points, in particular, stand out: NRWC has claimed the membership exception while at the same time proclaiming itself to be without members in nearly every other context. Furthermore, it specifically asked the FEC to sanction its claim without providing that agency with facts highly relevant to a determination. Under these circumstances, NRWC's decision to solicit cannot be viewed as "understandable error." *Cf. AFL–CIO v. FEC*, 628 F.2d at 99–100.

### C. Additional Constitutional Claims

NRWC and ERCC, claim that even if NRWC's supporters are not considered to be members who can be solicited for contributions there are other reasons which bar

---

**32.** *See* NRWC's and ERCC's Memorandum of Points and Authorities in Support of Motion for Summary Judgment at 48–49, where NRWC argues that under Virginia law, official recognition of members would require NRWC to hold an annual meeting, and that "compliance with such state law requirements would be prohibitively expensive . . . . "

**33.** *See* JEB Ex. 7.

**34.** *See* JEB Ex. 10.

**35.** *See* JEB Ex. 12–14.

**36.** *See* JEB Ex. 16, 18, 19.

**37.** *See* JSF ' 57; Deposition of Henry Walther, July 31, 1978.

**38.** 2 U.S.C § 437g(a)(7) provides in relevant part:

(7) In any civil action for relief instituted by the Commission . . . if the court determines that the Commission has established through clear and convincing proof that the person involved in such civil action has committed a knowing and willful violation of this Act . . . the court may impose a civil penalty of not more than the greater of (A) $10,000; or (B) an amount equal to 200 percent of the contribution or expenditure involved in such violation.

enforcement. First there is a question of a First Amendment challenge to the general limitations on corporate solicitation embodied in section 441b(b)(4) as applied to them. Second they contend that the FEC's handling of the initial request for an advisory opinion and the subsequent investigation of the administrative complaint violated due process.

### 1. Constitutionality of Limitations on Corporate Solicitation in 441b(b)(4)

The Committee argues that restricting solicitation by non–stock corporations to members directly abridges speech solely on the basis of content. The statute prohibits "solicitations" other than those made to limited classes of persons. NRWC and ERCC define a "solicitation" as "nothing more than a vehicle whereby facts, a request for a contribution, and opinions of the author are sent to a second person." This, the Committee continues, is precisely the type of political communication that is most clearly protected by the First Amendment. To regulate speech of this type on the basis of content, the government must demonstrate a compelling state interest and legislate with precision. *First National ·Bank v. Bellotti*, 435 U.S. 765, 786, 98 S.Ct. 1407, 1421, 55 L.Ed.2d 707 (1978). Secondly, NRWC argues that the prohibition on corporate solicitation interferes with the right to association, which is also protected by the First Amendment under the line of cases beginning with *NAACP v. Alabama*, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). The Committee points out that the right to associate is guaranteed by the Constitution and that the right to associate by contributing to political committees is recognized in the federal election law itself.[39] Any effort to limit solicitations to persons who are already members of an organization thus unconstitutionally interferes with the associational rights of non–members who may wish to contribute.

Since both of these rights–communication and association–are clearly protected by the First Amendment, the government may impose restrictions only by showing a compelling interest. *See, e. g., Bellotti*, 435 U.S. at 786, 98 S.Ct. at 1421; *Buckley*, 424 U.S. at 64–65, 96 S.Ct. at 656–657. Courts have found two interests behind the limitation on corporate expenditures in connection with federal elections. One is the protection of minority shareholders and union members who might disagree with the organization's choice of candidates and who would be "forced" to contribute through corporate earnings or union dues if direct expenditures were permitted. *See Pipefitters Local No. 562 v. United States*, 407 U.S. 385, 414–15, 92 S.Ct. 2247, 2264, 33 L.Ed.2d 11 (1972); *United States v. Boyle*, 482 F.2d 755, 763–65 (D.C.Cir.1973); *United States v. Chestnut*, 533 F.2d 40, 50, 51 n.12 (2d Cir. 1974), *cert. denied*, 429 U.S. 829, 97 S.Ct. 88, 50 L.Ed.2d 93 (1976). The second reason advanced is the need to maintain the integrity of federal elections: massive corporate or union spending on behalf of candidates greatly enhances the possibility or public fears that elected officials have been "bought." *See Bellotti*, 435 U.S. at 788–89, 98 S.Ct. at 1422- 1423; *Buckley*, 424 U.S. at 25, 96 S.Ct. at 637; *Pipefitters*, 407 U.S. at 415 -16, 92 S.Ct. at 2264–2265.

The Committee asserts that the first interest–protecting minorities–is not present in this case. NRWC members who disagree with corporate policy are free to terminate their association and stop contributing. No adverse economic consequences flow from ending this relationship, unlike the loss that might result if a dissident shareholder sold his holdings. NRWC allows that the second interest–maintaining electoral integrity– may be relevant here but argues that this interest would be served by the less restrictive means of placing limits on corporate contributions rather than banning expenditures outright.[40] Neither interest, NRWC

---

**39.** 2 U.S.C. § 441a allows political committees to accept contributions and make expenditures on behalf of candidates.

**40.** *See Buckley v. Valeo*, 424 U.S. at 26–29, 96 S.Ct. at 638–639.

concludes, can justify the abridgment of First Amendment rights created by the section 441b(b)(4) restriction on corporate solicitation, particularly after the Supreme Court's affirmation of the validity of corporate political speech in *Bellotti*.

At the outset, the Court notes that the provision under attack here, is an exception to the general proscription against corporate and union spending in connection with a federal election.[41] NRWC's argument is in essence an attack on the scope of the exception as too narrow: it infringes on the Committee's right to communicate, and on the constitutional rights of those persons who wish to receive the Committee's message and who may wish to associate with it. However, by arguing for a broader exception, NRWC is in effect attacking the general proscription on corporate spending itself. To permit NRWC to solicit more broadly would be to allow it to spend large amounts to contact the general public. It was precisely this practice that Congress sought to check in enacting the limitation on solicitations in the first instance.[42]

### a. *Prior Decisions*

The constitutionality of the general rule against corporate and union expenditures has never been considered by the Supreme Court. Lower federal courts have examined it, however, and in each instance the restriction has been upheld. In *United States v. Boyle*, 482 F.2d 755 (D.C.Cir.1973), the Court of Appeals for this Circuit upheld the conviction of a union official under 18 U.S.C. § 610, the predecessor of the current statute.[43] The Court rejected arguments, similar to those made in this case, that the government's interests in protecting electoral integrity could be advanced by other, less drastic means. 482 F.2d at 763–65.

Again, in *United States v. Chestnut*, 394 F.Supp. 581 (S.D.N.Y.1975), *aff'd*, 533 F.2d 40 (2d Cir. 1976), the same section survived a similar First Amendment attack by a union official. The district court found that the statute was supported by a compelling interest in electoral integrity, and that the statute furthered this interest by the least restrictive means possible. In affirming, the Second Circuit explicitly agreed with the district court's reasoning on the constitutional issues and added that "nothing in *Buckley v. Valeo*, . . . [citations omitted] . . . is to the contrary." 533 F.2d at 50, 51, n.12. Finally in *FEC v. Weinsten*, 462 F.Supp. 243 (S.D.N.Y.1978), the court considered the constitutionality of the prohibition against corporate and union expenditures, as recodified in Title 2, against a constitutional attack based on both *Buckley* and *Bellotti*. As in the earlier rulings, the court sustained the provision, noting that " . . . the absolute prohibition of corporate contributions constitutes the least drastic means of insuring the integrity of the political process." 462 F.Supp. at 249.

### b. *The Impact of Bellotti*

The NRWC nonetheless relies heavily on *First National Bank v. Bellotti*, to support its argument that a direct prohibition on solicitation violates the First Amendment because it interferes with the public's right to receive information. The nature of the expenditure involved, however, distinguishes the statute at issue here from the law invalidated in *Bellotti*. There, the Supreme Court struck down a Massachusetts criminal statute barring certain business corporations from making contributions or prohibited expenditures for purposes of "influencing or affecting the vote on any question submitted to the voters, other than one materially affecting any of the property, business or assets of the corporation" as well as referenda on individual income taxation.[44] After noting that this statute restricted speech solely on the basis of subject matter and the identity of the interest involved, the Court rejected the two "compel-

---

**41.** *See* footnotes 11, 12 *supra*.

**42.** *See* footnote 24 *supra*.

**43.** *See* footnote 11 *supra*.

**44.** Mass.Gen.Laws Ann., ch. 55, § 8 (West Supp. 1977), *cited in First National Bank v. Bellotti*, 435 U.S. at 768 n.2, 98 S.Ct. at 1411 (1978).

ling" interests advanced by the state to justify the prohibition. Those interests–the protection of minority interests and the preservation of the integrity of the election process–are the same as those that have been advanced to justify limitations on corporate expenditures in federal elections.

■ The critical distinction lies in the threat to these interests posed by corporate spending on referenda, as opposed to spending in connection with candidate elections. As the Court pointed out, "[r]eferenda are held on issues, not candidates for public office. The risk of corruption perceived in cases involving candidate elections . . . [citations omitted] . . . simply is not present on a popular vote on a public issue." 435 U.S. at 790, 98 S.Ct. at 1423. As the NRWC's solicitation letters themselves reveal, the Committee's solicitation efforts were in connection with the 1976 federal elections. The interest in protecting public confidence in elections, absent in *Bellotti*, is fully present here.[45] Accordingly, the reasoning and results of earlier cases sustaining prohibitions on corporate expenditures control here in an attack on the scope of an exception to that prohibition. The government has a compelling interest in protecting the integrity of federal elections which justifies section 441b(b)(4)'s limitations. Since preserving the citizen's confidence in government is an interest of the "highest importance," *Bellotti*, 435 U.S. at 789, 98 S.Ct. at 1422, the Court finds that this interest alone is sufficiently compelling to sustain any restriction on free speech created by the limitation on corporate solicitations at issue here.

NRWC's associational rights claim falls before the same compelling interest. "Neither the right to associate nor the right to participate in political activities is absolute in any event." *Civil Service Commission v. National Association of Letter Carriers*, 413 U.S. 548, 567, 93 S.Ct. 2880, 2891, 37 L.Ed.2d 796 (1973). *See Buckley*, 424 U.S. at 25, 96 S.Ct. at 637. Any infringement on the associational right asserted here–the right to join together to contribute to the National Right to Work Committee's political action fund–is scarcely of the magnitude of that at issue in *Letter Carriers*. There the Supreme Court reaffirmed the constitutionality of the Hatch Act's prohibition on government employee's participation in political campaigns. 413 U.S. at 553, 567, 93 S.Ct. at 2884–2891. In contrast, NRWC's supporters and sympathizers are still free to exercise a full range of political and associational rights on behalf of NRWC and its goals. And to the extent the statute restricts the Committee's ability to solicit, it represents a marginal infringement on these rights and is fully justified by the need to protect the electoral process. In sum, section 441b(b)(4) cannot be considered an unconstitutional infringement on the right of free speech or association guaranteed by the First Amendment.

### 2. Due Process Claims

As a final defense to the FEC's enforcement efforts NRWC presents a due process challenge based on the entire history of this matter beginning with its initial request for an advisory opinion. The Committee argues that the FEC delay in responding to the request for the advisory opinion, the resistance to compromise in the conciliation process, and partisan influences on the processing of the advisory opinion and administrative complaint combine to vitiate the enforcement action. There is little merit in any of these claims.

---

**45.** A second factor sets this case apart from *Bellotti*. As the Supreme Court pointed out, the Massachusetts referendum law had the effect of excluding certain points of view–those of banks and certain other corporations–from debates on public issues. 435 U.S. at 784, 98 S.Ct. at 1420. The Court stated, "[w]here, as here, the legislature's suppression of speech suggests an attempt to give one side of a debatable public question an advantage in expressing its view to the people, the First Amendment

is plainly offended." *Id.* at 785–86, 98 S.Ct. at 1420 (footnote omitted).

In contrast, to the extent that the federal statute challenged here regulates speech, it does so evenhandedly. No single viewpoint is aided or prejudiced; membership organizations and non–stock corporations of all types, as well as business corporations and labor unions, all face similar restrictions on their ability to solicit.

NRWC requested an advisory opinion on January 6, 1976. As previously noted, on January 30, *Buckley* invalidated the Commissioner selection process and otherwise denied the Commission's authority to act. That authority was not restored until May 11, 1976, when Congress passed the Federal Election Campaign Act Amendments of 1976. The NRWC was advised of the reasons for the delay and was invited to resubmit its request after proposed regulations had been issued.[46] The request was renewed and the FEC staff drafted an advisory opinion. The draft was withdrawn, however, when the staff learned that NRWC's own corporate documents provided that it would have no members.[47] Shortly thereafter, a complaint was filed with the FEC alleging that NRWC had violated the Act by soliciting non–members–the very practice for which NRWC had sought the advisory opinion. Action on the request was then suspended pending the outcome of the administrative complaint. As these facts indicate, the delay in processing the advisory opinion was due in part to circumstances beyond the agency's control, and in part to NRWC's own failure to provide all of the relevant material.

█ The argument that NRWC was denied conciliation finds no support in the record. The parties engaged in prolonged conciliation efforts, extending to at least four months beyond the 30 day minimum required by the statute. Both sides offered proposals and counterproposals.[48] Merely because NRWC failed to get a favorable result in conciliation does not amount to a denial of due process. The statute requires a conciliation period, it does not require settlement.

█ Finally, NRWC argues that the partisan political motives of "pro–labor" Commissioner Thomas Harris and certain staff members prevented NRWC from receiving a prompt ruling on its advisory opinion request and resulted in overzealous

prosecution of the administrative complaint. This claim was rejected by an earlier Court order of May 4, 1979. No sufficient reasons have been advanced to change that ruling. The suggestions of bias in the handling of the administrative complaint overlook the fact that the Commissioners voted unanimously to find "reasonable cause" to believe NRWC had violated the law and later, after a staff investigation, to find "probable cause" a violation had occurred. Neither the advisory opinion process followed here nor the investigation denied NRWC's right to due process so as to prevent the Court from finding that NRWC violated the Federal Election Campaign Act.

## CONCLUSION

To summarize briefly: the limited exception allowing corporations without capital stock to solicit their members for contributions is not unconstitutionally vague and the limits on corporate solicitation do not violate the rights to free speech and association secured by the First Amendment. Further, NRWC and ERCC have violated the Federal Election Campaign Act by soliciting contributions from persons who were not members of NRWC. Finally, the Court finds the violations to be "knowing and willful" in that NRWC, in an effort to secure an advisory opinion sanctioning these solicitations, failed to reveal highly pertinent facts which tended to disprove its entitlement to the exception it claimed.

Under these circumstances, the Court concludes that the Federal Election Commission is entitled to the following relief: 1) a declaration that the challenged provisions of FECA are constitutional; 2) an order enjoining NRWC and ERCC from soliciting persons for contributions to ERCC or any other separate segregated fund in violation of FECA; 3) an order requiring NRWC and ERCC to refund all money collected as a result of the unlawful 1976 solicitations; and 4) the assessment of a

---

**46.** *See* JEB Ex. 9.

**47.** *See* footnote 8 *supra*.

**48.** NRWC's and ERCC's Memorandum of Points and Authorities in Support of Motion for Summary Judgment 39–41.

civil penalty against NRWC and ERCC in the amount of $10,000.00.